[NOTE. See In re Dole, Case No. 3,964.]

DOLE, Ex parte. See Case No. 9,181.
DOLE (ANDREWS v.). See Case No. 373.

## Case No. 3,966.
DOLE et al. v. NEW ENGLAND MUTUAL MARINE INS. CO.

[2 Cliff. 394.][1]

Circuit Court, D. Massachusetts. Oct. Term, 1864.

MARINE INSURANCE — CONSTRUCTION OF POLICY — CAPTURE AND BURNING BY REBEL PRIVATEER — PREDOMINATING CAUSE OF LOSS.

1. Where a ship was taken and burned by the commander of a rebel privateer, during the late Rebellion, *held*, that the capture was not a taking by pirates or assailing thieves, inasmuch as it appeared that the policy upon the vessel was executed before the Rebellion broke out, and that the commander acted under a commission in due form issued by the government of the rebellious states.

[Cited in Ford v. Surget. 97 U. S. 619; The Ambrose Light, 25 Fed. 422.]

[1] [Reported by William Henry Clifford, Esq. and here reprinted by permission.]

2. Construed separately from the marginal clause, the terms of the policy would entitle the plaintiff to recover, but the legal effect of the marginal words, "warranted free from capture, seizure, or detention," &c., is, that the insurers are no more liable for a loss occasioned by those perils, than they would have been if the body of the policy had contained no stipulation to that effect, or if the stipulation therein had been that they should not be liable for such losses.

3. Loss by capture not being included in the policy, it is clear that the plaintiff cannot recover, unless it can be held that the fire, and not the taking of the ship, was the proximate cause of the loss.

4. Seizure of ships at sea by the ruling power of a country in a time of territorial war is a capture within the meaning of the law of insurance, although the war is waged on one side by a rebel government and people; and it seems also that the word "capture" is sufficiently comprehensive to include a taking by pirates.

[Cited in The Ambrose Light, 25 Fed. 416, 431.]

5. When different causes concur in occasioning a loss, the rule is, that the loss must be attributed to the efficient predominating peril, whether that peril was or was not in activity at the final consummation of the disaster.

[Cited in The Ontario, 37 Fed. 224; Northwest Transp. Co. v. Boston Marine Ins. Co., 41 Fed. 802.]

Action of assumpsit [by Charles E. Dole and others] on a policy of insurance. Facts agreed: The policy described in the declaration was dated on the 19th of November, 1860, and purported to insure the ship Golden Rocket, for one year, "against the perils of the seas, fire, enemies, pirates, assailing thieves, restraints, and detainments of all kings, princes, and people, of what nation or quality soever, barratry of the master (unless the insured be master of the vessel) and of the mariners, and all other losses and misfortunes which have or shall come to the damage of the said ship, or any part thereof, to which insurers are liable by the rules and customs of insurance in Boston." The stipulation in the policy also was, "that in case of capture or detention, the insured shall not have the right to abandon therefor until proof is exhibited of condemnation or of the continuance of the detention (by capture or other arrest) for at least ninety days." There was also an agreement inserted into the policy "that the insurers should not be answerable for any charge, damage, or loss which might arise in consequence of a seizure or detention for or on account of illicit or prohibited trade, or trade in articles contraband of war." The margin of the policy contained the following clause: "Warranted free from capture, seizure, or detention, or the consequences of any attempt thereat, the clause herein embodied touching said perils or adventures to the contrary notwithstanding."

The agreed statement showed that the Golden Rocket was an American merchant vessel of six hundred tons' burden, and that she was insured for the sum of $10,000. It was also agreed that the vessel was in good condition; that she had no armament; and

that the ship's company consisted of the master, two mates, and eleven men; that on the 3d of July, 1861, off the Isle of Pines, she met with the Sumter, an armed steamer, with the American flag and a pennant set, commanded by Raphael Semmes, a citizen of Maryland, and previously an officer in the United States navy, but not at that time commissioned or authorized by the government, who, upon the Golden Rocket's setting her colors in answer, and while nearly a mile off, fired a shotted gun across her, and then boarded her with an armed boat, and with a force which the officers and crew of the Golden Rocket were unable and did not attempt to resist, plundered her of the ship's papers, some sails, spars, provisions, and other articles, took out her officers and crew, and set the ship on fire, by which she was totally destroyed. The interest of the plaintiffs in the vessel, due notice, proof of loss, abandonment, and demand of payment as for a total loss, were admitted.

The plaintiffs insisted that the text of the policy already referred to, had respect chiefly to two classes of marine risks, as appeared from the words of the provision. First, risks of capture or detention arising from acts of government, as shown by the words "enemies' restraints, and detentions of all kings, princes, and people of what nation or quality soever," for which, if irregular or unlawful, the citizen may have redress through his own government. Second, such risks as arise from the lawless depredations of individuals, as shown in the policy by the words "pirates and assailing thieves," against which the contract of insurance is the only security. They contended that the marginal clause did not import a warranty, but only that the insurers should not be liable for the losses specified in the clause, just as if such losses had not been included in the body of the policy. Again, they contended that the loss in this case having arisen from a taking by rebels on the high seas, was a loss by pirates or assailing thieves, and not one arising from capture, seizure, or detention, within the meaning of the policy described in the declaration. But if the court ruled otherwise, then they contended that the proximate cause of the loss was not the taking set forth in the agreed statement, but the fire, which, as they insisted, was not "the consequence of any attempt thereat," as described in the marginal clause.

The date of the policy showed that it was executed when the United States were at peace with all the world, and one month before the so-styled Confederate States, or any of them, had made any attempt to secede or withdraw from the Union. When the loss occurred, on the 3d of July, 1861, those states, as the parties agreed, had organized a Confederacy of said states, and a government for the Confederacy, and had established for the same a written constitution. The record also showed that such form

of government was in fact organized in all its departments, legislative, executive, and judicial; that they had raised and organized an army and created a navy; and that on the 6th of May, 1861, a body of persons acting as the congress of such Confederate States published an act, which they had passed, declaring that war then existed between the Confederate States and the United States, and providing measures for its vigorous prosecution. They had not only made provision for the prosecution of the war, but the agreed statement also showed, that those states at the time of the loss were carrying on hostilities against the United States by land and sea, and had for that purpose an army of over fifty thousand men in the field, and that they had possession of and exercised all the functions of government over all the territory included within the limits of those states, except a few military posts which were held by the military power of the United States. It was also agreed that the Sumter was purchased, armed, equipped, and manned by such Confederate States as and for a public armed vessel, with officers commissioned in due form, and was cruising under a commission from said Confederate States, to attack, capture, or destroy the vessels belonging to the government of the United States or to any citizens thereof, and none other. Furthermore, it was agreed that her commander had a commission as captain in such navy, and was prevented from taking the Golden Rocket into port by the danger and difficulty arising from our blockade; and that whatever was done by the officers and crew of the Sumter was done under the assumed authority of such Confederate States, and for the purpose of prosecuting the war, so declared to exist, and with the sole design and intent of coercing the government of the United States to acknowledge the independence of the Confederate States.

R. H. Dana, Jr., and H. Gray, Jr., for plaintiffs.

The clause in the body of the policy specified two classes of risks:—

First, from acts of governments, "enemies," "restraints and detainments of all kings, princes, and people, of what nation or quality soever," for which if irregular or unlawful the citizen may have redress through his own government.

Second, from individual depredation, "pirates and assailing thieves," against which "assurance is the only security." The first of these classes would not, the second would, if not specified, be included in "the perils of the sea." 3 Kent, Comm. (6th Ed.) 303; 1 Phil. Ins. §§ 1106, 1108; Arn. Ins. §§ 303, 305, 306; Maude & P. Shipp. 23, 231, 232; 2 Pars. Mar. Law, 236. 246; Nesbitt v. Lushington. 4 Term R. 788; 3 Kent. Comm. (6th Ed.) 216, 300; 2 Moll. De J. Mar. c. 7, § 14; Garrison v. Memphis Ins. Co., 19 How. [60 U. S.] 314.

"Enemies" are evidently governments, vested according to the law of nations and in the view of our own government, with belligerent rights. If "enemies" included those acting under no national authority, the addition of the word "pirates" in the policy would be superfluous.

It is perfectly well settled that the words "arrests, restraints, and detainments of kings, princes, and people, of what nation, condition, or quality soever," extend only to acts of "nations in their collective capacity." M'Call v. Marine Ins. Co., 8 Cranch [12 U. S.] 66; Olivera v. Union Ins. Co., 3 Wheat. [16 U. S.] 189, 190; Bradlie v. Maryland Ins. Co., 12 Pet. [37 U. S.] 402; Gracie v. New York Ins. Co., 13 Johns. 170.

The only opinion in favor of a wider signification is in South Carolina. Simpson v. Charleston F. & M. Ins. Co., Dud. (S. C.) 243.

The clause in the margin of the policy— "warranted free from capture, seizure, or detention, or the consequence of any attempt thereat; the clause herein embodied, touching said perils or adventures, to the contrary notwithstanding"—does not import a "warranty," in the sense of the law of insurance; but only that the insurers shall not be liable for the losses specified in the exception, just as if such losses had not been included in the body of the policy. 1 Phil. Ins. § 1150.

This clause is to be interpreted with reference to the text of the policy, and, being introduced by the insurers and for their benefit, is in case of doubt to be construed most strongly against them, and so as to give fair effect to the general words of the policy. Yeaton v. Fry, 5 Cranch [9 U. S.] 341; Palmer v. Warren Ins. Co. [Case No. 10.698]; Blackett v. Royal Exchange Assur. Co., 2 Cromp. & J. 251; Bullen v. Denning, 5 Barn. & C. 843; Western Ins. Co. v. Cropper, 32 Pa. St. 351; Lawrence v. Aberdein, 5 Barn. & Ald. 108; Gabay v. Lloyd, 3 Barn. & C. 793; Suckley v. Delafield, 2 Caines, 222; American Ins. Co. v. Dunham, 12 Wend. 463; Havelock v. Hancill. 3 Term R. 277; Bowne v. Shaw, 1 Caines, 489; Cucullu v. Louisiana Ins. Co.. 8 Mart. (La.) 613; Johnston v. Ludlow, 1 Caines, Cas. xxix; Smith v. Delaware Ins. Co., 3 Serg. & R. 82; Faudel v. Phoenix Ins. Co., 4 Serg. & R. 59; Carrington v. Merchants' Ins. Co., 8 Pet. [33 U. S.] 518, 524.

The words "capture, seizure, and detention," taken together, and with reference to the body of the policy and the mode of their insertion, are confined to the acts of governments only. They are generally called the "war clause," and have long been in common use. Green v. Brown, 2 Strange, 1199; O'Reilly v. Royal Exchange Assur. Co.. 4 Camp. 246; Hahn v. Corbett, 2 Bing. 205; McCargo v. New Orleans Ins. Co., 10 Rob. (La.) 313.

Even the word "capture," standing alone, though sometimes loosely used to include any forcible taking from without, more appropriately and naturally denotes, and is lim-

ited to a capture jure belli, whether lawful or unlawful in the particular case, made by a power authorized to wage war. Wheat. Mar. Capt. 52, 54; 1 Harg. Collect. Jurid. 137; 1 Park, Ins. 66; 2 Arn. Ins. 807; 1 Kent, Comm. 100, 101; Phil. Ins. § 1110; 3 Kent, Comm. 303.

A taking by pirates has none of the effects of such capture. Tirrell v. Gage, 4 Allen, 249; Barney v. Maryland Ins. Co., 5 Har. & J. 139; Williams v. Armroyd, 7 Cranch [11 U. S.] 423; The Nueva Anna, 6 Wheat. [19 U. S.] 193; Case of Piracy, 12 Coke, 73; Greenway v. Baker, Godb. 193; The Hercules, 2 Dod. 372; The Calypso, 2 Hagg. Adm. 213; 1 Phillim. Int. Law, 379; 1 Kent, Comm. 184.

Seizure, though sometimes applied to any act of seizing, especially when accompanied by "piratical," "mutinous," "barratrous," or other similar adjective, commonly means in a policy of insurance an arrest by act of government, either by municipal law or the law of prize. But when used in connection with capture. as in this marginal clause, it is ejusdem generis, though it may include cases in which no condemnation to change the title is looked for. The Caledonian, 4 Wheat. [17 U. S.] 103; The Apollon, 9 Wheat. [22 U. S.] 372; Carrington v. Merchants' Ins. Co., 8 Pet. [33 U. S.] 518; Bradstreet v. Neptune Ins. Co. [Case No. 1,793]; Higginson v. Pomeroy, 11 Mass. 110; Mellish v. Andrews, 15 East, 15; The Diligentia, 1 Dod. 405; The Amor Parentum, 1 C. Rob. Adm. 303; The Eagle, 1 W. Rob. Adm. 245; Lubbock v. Potts, 7 East, 449; Black v. Marine Ins. Co., 11 Johns. 292; Jecker v. Montgomery, 13 How. [54 U. S.] 515; 2 Arn. Ins. § 306.

A taking by rebels on the high seas is a loss by "pirates or assailing thieves," not a "capture, seizure, or detention." within the meaning of this policy. 2 Seld. Mare Claus. c. 10, 1313; Ducange, Gloss. voce "Pirata;" 3 Co. Inst. 113; Co. Litt. 391a; Calvinus, Lexicon, voce "Pirata;" 1 Hawk. P. C. c. 37, § 4; 1 Russ. Crimes, 94; 3 Chit. Cr. Law, 1127; 1 Stat. 114; U. S. v. Palmer, 3 Wheat. [16 U. S.] 610; U. S. v. Hutchins [Case No. 15,429]; U. S. v. Tully [Id. 16,545]; U. S. v. Klintock, 5 Wheat. [18 U. S.] 151; U. S. v. Brailsford, 5 Wheat. [18 U. S.] 188; [Act of May 15, 1820] 3 Stat. 600; 1 Kent, Comm. 186.

By the laws of England, France, and Holland, as well as our own, a citizen cruising against his own government with an armed vessel under a commission from a foreign state is a pirate. 2 Valin, Ord. de la Marine, 235; Bynk. Qu. Jur. Pub. lib. 1, c. 17; 1 Hume, Cr. Law, 477; Trial of Golding, 12 How. St. Tr. 1269; 1 Phillim. Int. Law, 406; 1 Hawk. P. C. c. 37, § 4; 1 Moll. De J. Mar. c. 4, § 24; Evans' Case, 2 East, P. C. 798; Prov. St. 8 Wm. III.; 4 Mass. Col. Rec. pt. 2, 563; 7 Dane, Abr. 90; St. 11 & 12 Wm. III., §§ 1, 14, 15; 2 Chalm. Op. 202, 219, 221; Trial of Quelch, 14 How. St. Tr. 1067; Const. Mass. 1780, c. 6, § 6; 1 Stat. 114; 1 Kent, Comm. 191; 10 Am. Jur. 267.

By the most eminent civilians and writers on the law of nations, piracy is defined to be "the offence of depredating on the high seas without being authorized by any sovereign state or with commissions from different sovereigns at war with each other." Wheat. Int. Law, pt. 2, p. 89; Bynk. Qu. Jur. Pub. lib. 1, c. 17; Du Ponceau, Law of War, 127, 128, note; 2 Azuni, Del Diritto Marittimo, pt. 2, c. 4, art. 7, §§ 2, 5; Casaregis, De Commercio, disc. 24, § 25; Id. disc. 64, §§ 4, 5; Moll. De J. Mar. c. 4, §§ 18, 20; 2 Browne, Civ. & Adm. Law, 461; Emerig. Assur. c. 12, sect. 28, § 1; Dawson's Trial, 13 How. St. Tr. 454; Vaughan's Trial, Id. 525.

"Hostis humani generis" is no part of the definition of a pirate, but merely indicative of what is likely to be his character. 1 Phillim. Int. Law, 402; The Serhassan, 2 W. Rob. Adm. 357; The Malek Adhel, 2 How. [43 U. S.] 232. See 1 Hume, Cr. Law, 477; 1 Hawk. P. C. c. 37, § 1; 3 Chit. Cr. Law, 1127; 1 Russ. Crimes, 100.

Rebels are not entitled by the law of nations to any rights as belligerents against their own country. Klauber, Droit des Gens, 235; Gro. De J. B. proleg. 9, § 25; Id. lib. 1, c. 3, arts. 1, 4; Id. lib. 3, c. 3; 2 Ruth. Inst. lib. 2, c. 9, p. 438; Hall, Int. Law, c. 14, §§ 9, 25; Tirrell v. Gage, 4 Allen, 249; The Venus, 8 Cranch [12 U. S.] 280; 3 Co. Inst. 11; 1 Hale, P. C. 159; U. S. v. Chenoweth [Case No. 14,792].

The manner of the taking of the Golden Rocket was piratical; she was taken under false colors; despoiled without being condemned. The Peacock, 4 C. Rob. Adm. 187; Hall. Int. Law, c. 16, § 24; U. S. v. Klintock, 5 Wheat. [18 U. S.] 150; Jecker v. Montgomery, 13 How. [54 U. S.] 516; The Elsebe, 5 C. Rob. Adm. 183; 1 Wheat. [14 U. S.] Append. 496; 2 Wheat. [15 U. S.] Append. 2, 3, 81; Hall. Int. Law, c. 30, §§ 5, 28; Id. c. 31, §§ 14, 22; Del Col v. Arnold, 3 Dall. [3 U. S.] 333; 1 Moll. De J. Mar. c. 4, §§ 18, 20.

The treasonable intent does not make the act less piratical. 1 Hawk. P. C. c. 29, § 11; Trial of Woodburne and Coke, 16 How. St. Tr. 81; Com. v. McPike, 3 Cush. 181; Com. v. Burke, 14 Gray, 100; 1 Moll. De J. Mar. c. 4, §§ 9, 10.

How can a citizen of the United States, committing acts of hostility upon the high seas against other citizens of the United States, find protection under a commission, from an organization claiming to be an independent government within the territory of the United States, which he is bound to know, and our courts are bound to hold to be illegal? Church v. Hubbart, 2 Cranch [6 U. S.] 236; Haven v. Foster, 9 Pick. 130; 4 Bl. Comm. 27; In re Barronet, 1 El. & Bl. 1; Rex v. Bailey, Russ. & R. 1; The Ann [Case No. 397]; Fisher v. McGirr, 1 Gray, 48; Kelly v. Bemis, 4 Gray, 83; Little v. Barreme, 2 Cranch [6 U. S.] 179; Mitchell v. Harmony, 13 How. [54 U. S.]

137; U. S. v. Jones [Case No. 15,495]; Com. v. Blodgett, 12 Metc. [Mass.] 91.

The court must look to the political department, for a rule, upon the effect of the exclusive occupation by the rebels of a part of the dominion of the United States; upon the recognition of the rebels as belligerents by Great Britain and France, upon the position of the government towards rebel cruisers. Gelston v. Hoyt, 3 Wheat. [16 U. S.] 324; Rose v. Himely, 4 Cranch [8 U. S.] 241; U. S. v. Palmer, 3 Wheat. [16 U. S.] 634; Hardy's Trial, 24 How. St. Tr. 1371; Halleck, Int. Law, c. 3, § 22; The Hercules, 2 Dod. 360; Kennett v. Chambers, 14 How. [55 U. S.] 38; The Pelican, Edw. Adm. Append. D; Dudley v. Folliott, 3 Term R. 584; Ogden v. Folliot, Id. 726; Barclay v. Russell, 3 Ves. 424; Dolder v. Huntingfield, 11 Ves. 294; Hogsheads of Sugar v. Boyle, 9 Cranch [13 U. S.] 195; U. S. v. Hayward [Case No. 15,336]; U. S. v. Rice, 4 Wheat. [17 U. S.] 246; Cross v. Harrison, 16 How. [57 U. S.] 191; Gro. De J. B. lib. 3, c. 6, §§ 4-27; Puffendorf, lib. 4, c. 9, § 8; Id. lib. 7, c. 7, § 5; Id. lib. 8, c. 11, § 8; The Dart and The Happy Couple, cited 1 Edw. Adm. 1; The Gerasimo, 11 Moore, P. C. 96; The Hercules, 2 Dod. 360; The Lilla [Case No. 8,348]; Proclamations of April 15, 19, 27, May 3, and August 16, 1861, and July 25, 1862; 11 Stat. 268, 281, 283-285, 295, 311, 314; President's Messages of July and December, 1861, and December, 1862; Judge Sprague's Charge upon the Law of Piracy [Fed. Cas. Append.]; The Amy Warwick [Case No. 341]; The Lilla [supra]; Smith's Trial,[2] Cir. Ct. U. S. (Pa.) Oct., 1861; Trial of Savannah Privateersmen [Case No. 12,386]; Mr. Seward to Mr. Adams, May, 1862; Report of Committee on Commerce of United States Senate, June 21, 1862, adopted by the senate.

This branch of the case stands thus:—

These acts in their physical character are sufficient to constitute piracy.

If not done in acknowledged warfare, these acts are piracy; and this not by municipal law of the United States, but by the general law of nations.

To take these acts out of the category of piracy, the political government to which the court looks must have recognized the actors as belligerents.

A neutral government, as it claims no sovereign authority, recognizes an insurgent power as belligerent once for all, for all cases and under all circumstances.

Not so the sovereign. The object of his war is to enable himself to exercise sovereign power. He never, therefore, intermits that, de jure. He never intermits it de facto, prospectively, or in all cases and for all purposes. He intermits it only de facto in such cases, to such extent, and for such purposes, as policy dictates.

---

[2] [Nowhere reported; opinion not now accessible.]

In this case, the acts in question having been committed by and upon citizens of the United States, the contract in suit having been made here between citizens, and the forum being a court of the United States, the only government to which the court can look is the political government of the United States.

The rebels doing these acts cannot be deemed belligerents, unless it be true either that the government has made a general recognition of belligerent rights in the rebels, or that the government has treated the rebels as belligerents in fact, in any case, or for any purposes, they must as matter of law be adjudged belligerents in all cases and for all purposes.

The first would make the very exercise of belligerent rights by the government deprive it of its rights of sovereignty. The second would transfer the conduct of public policy from the political to the judicial department.

The source of the rebels' commissions is not recognized as sovereign by any nation of the world. The rebels have been recognized as belligerents by two nations only, against the protest of the United States. Those recognitions are conclusive on the courts and citizens of those nations. But on the question of the status of citizens, in arms against their government, or the character of their acts, the policy of one or two neutrals cannot furnish the law for a tribunal of this government.

The government of the United States has done no act, amounting to a general recognition of belligerent rights in the rebels. It has protested against such a recognition by neutrals. Its proclamations before the destruction of the Golden Rocket had declared them to be insurgents, and their cruisers pirates. It has since the taking of the Golden Rocket ordered trials, and allowed a conviction, for piracy, of such cruisers.

The exchange of prisoners, and practice of the usages of civilized warfare, are, on the part of the sovereign, matter of policy from day to day, and do not warrant his courts in holding that the rebels have in a court of law the status of belligerents. Vattel, lib. 3, §§ 294, 295.

If the taking of the Golden Rocket was a "capture, seizure, or detention," within the meaning of the exception, still the proximate cause of the loss was not such taking, but the fire, which was not "the consequence of any attempt thereat," but which occurred after the taking was complete, and all the officers and crew had been taken out of her.

If the taking was a "capture, seizure, or detention," it was illegal, and not followed by lawful condemnation, and for each of these reasons did not divest the plaintiffs of their property, nor take away their insurable interest in the ship. 1 Phil. Ins. § 194; 2 Pars. Mar. Law, 78, 79, and cases cited.

If this was a belligerent capture, it had not been completed by condemnation, so as to

divest the plaintiffs' title; if it was a piratical taking, their title, of course, remained good.

The omission of a belligerent captor to send in a prize for adjudication, by reason of the maritime superiority of the enemy, though it may justify the captor and his government in destroying or abandoning her, does not, as between third parties, make the mere taking, equivalent to a condemnation, in changing the title and divesting interest.

No capture or taking is of itself an actual total loss of the ship either in fact, or by the law of insurance, before entire destruction or lawful condemnation. Although it is a constructive total loss which the owners may, by abandoning their interest to the underwriters while the detention continues, make an actual total loss, yet they are not obliged to make an abandonment, but may retain their interest and recover for a total or partial loss, according to the injury actually proved. 2 Phil. Ins. § 1493; 2 Arn. Ins. 998.

Fire is a distinct risk, to which the underwriters remain liable while exempt from losses for other perils, although such other perils have exposed the ship to the loss by fire. Garrison v. Memphis Ins. Co., 19 How. [60 U. S.] 314; Airey v. Merrill [Case No. 115]; Pelly v. Royal Exch. Assur. Co., 1 Burrows, 341; Emerig. Assur. c. 12, sect. 17, § 1; Patapsco Ins. Co. v. Coulter, 3 Pet. [28 U. S.] 236.

The fire not having been a means used in attempting to take or actually taking possession of the ship, but having occurred after the taking was complete, and after her assailants had obtained undisputed possession of her, and taken out her officers and crew, was the proximate and efficient, and by law the sole cause of the loss, according to the familiar maxim, "causa proxima non remota spectatur." Gordon v. Rimmington, 1 Camp. 123; Jones v. Schmoll, 1 Term R. 130, note; Forster v. Christie, 11 East, 209; Rice v. Homer, 12 Mass. 234; Livie v. Janson, 12 East. 648; Hodgson v. Malcolm, 2 Bos. & P. (N. R.) 340; Redman v. Wilson, 14 Mees. & W. 476; Ionides v. Universal Mar. Ins. Co., 8 Law T. (N. S.) 705; Waters v. Merchants' Louisville Ins. Co., 11 Pet. [36 U. S.] 219; Lovering v. Mercantile Mar. Ins. Co., 12 Pick. 369.

To sum up the whole matter, the plaintiffs contend:—

1. The loss was by "pirates and assailing thieves," within the term of the policy; and therefore total, as soon as the ship was taken.

2. The case is not within the excepted risks, in the margin, of "capture, seizure, detention, or the consequences of any attempt thereat."

3. If this taking was a loss within the exception, it was not total without condemnation, or continuance of the detention for ninety days; and, before either of those contingencies happened, she was totally lost by fire, a distinct peril, for which the insurers are liable.

4. If the defendants are neither liable for the loss of the ship by fire, or not liable for her loss at all, they are liable, as under a loss by "pirates and assailing thieves," for the tackle, apparel, and other articles of which the Sumter's men plundered the ship, and which they took no steps to have condemned. Phil. Ins. §§ 463, 1223.

B. R. Curtis and J. J. Storrow, for defendants.

This was not a loss by "pirates," within the meaning of these policies.

The word "pirates" may be used to designate either of two distinct classes of persons: the first being those deemed pirates by the law of nations; the second, those required by the municipal law of some particular country, to be adjudged to be pirates for the purposes of criminal procedure and punishment. Append. 5 Wheat. [18 U. S.] 8; U. S. v. Smith. 5 Wheat. [18 U. S.] 153; [Act March 3, 1819] 3 Stat. 513; [Act April 30, 1790] 1 Stat. 114; U. S. v. Pirates, 5 Wheat. [18 U. S.] 196; The Antelope, 10 Wheat. [23 U. S.] 122; 1 Kent, Comm. 186; 7 Dane, Abr. 94; Bynk. Jus. Priv. lib. 1, c. 117; Le Louis, 2 Dod. 244.

These policies use the word "pirates" in that simple and ordinary sense in which it now is and immemorably has been known to the general commercial law of the civilized world; and not to describe offenders against some municipal criminal law, of some particular country.

The peril of pirates was to be encountered on the high seas, where the common law of nations prevails, and declares who are "pirates."

The sole office of these municipal laws is to prescribe criminal procedure and punishment in certain cases which are not piracy, as if they had been piracies. But a policy of insurance has no connection with criminal procedure, or the punishment of offenders. U. S. v. Pirates, 5 Wheat. [18 U. S.] 196.

The interpretation and effect of policies of insurance belong to another system of law, existing before these statutes were passed, and not intended to be affected by them. This system of law is not merely a branch, or division of municipal law; but belongs to and is part of the common law of nations, which defines piracy. 1 Marsh. Ins. 19; 1 Duer, Ins. 2; Warren v. Manufacturers' Ins. Co., 13 Pick. 518; Deshon v. Merchants' Ins. Co., 11 Metc. [Mass.] 199; The Malek Adhel, 2 How. [43 U. S.] 232; The Antelope, 10 Wheat. [23 U. S.] 122; 3 Kent, Comm. 342, 343; 1 Phil. Ins. Pref. 7, ad fin., and 77; 1 Arn. Ins. 12, and citations passim; U. S. v. Smith, 5 Wheat. [18 U. S.] 162.

Policies of insurance have no reference to the legality of governments; they refer always to de facto authority, of king, princes, and people; and an interpretation which

should make a risk depend on the legality of an actual government, under whose authority the property had been captured, seized, or detained, would be unprecedented and dangerous. Nesbitt v. Lushington, 4 Term R. 783.

The acts of the Sumter were not the acts of pirates under the law of nations. 1 Kent, Comm. 183; Warburton, 368–376; Append. 5 Wheat. [18 U. S.] 8; U. S. v. Smith, 1d. 153, and note; U. S. v. Pirates, 1d. 196; The Malek Adhel, 2 How. [43 U. S.] 211; Davison v. Sealskins [Case No. 3,661]; 1 Lemonier, Ins. 251.

The facts find the existence of a commission, and that the capture was made in pursuance of it.

They find that the commission was to cruise against the commerce and property of the United States and of its citizens only.

The executive government of the United States has by public proclamations and messages to congress, and in other appropriate public documents, recognized and affirmed the existence of open and public war existing between the United States and a de facto government of the so-called Confederate States. President's Proclamation of April 19, 1861; President's Reply to the Virginia Commissioners; President's Proclamation of April 27, 1861; President's Message to Congress, July 4, 1861; President's Proclamation of August 12, 1861; President's Proclamation of August 16, 1861.

The United States has, in respect to the government and people of the so-called Confederate States, both sovereign and municipal rights; under the first they wage war; under the second they hold all persons, property, and acts subject to constitutional criminal laws of congress. Rose v. Himely, 4 Cranch [8 U. S.] 272; Halleck, Int. Law. 344.

But the existence of these laws of congress and the illegality of the acts of the Confederate States and their people, when tested by them, can have no bearing on the question whether the law of nations has been infringed. The Antelope, 10 Wheat. [23 U. S.] 122; 1 Stat. 114.

And the United States cannot at the same time insist that they have the belligerent rights which by the law of nations belong to a sovereign waging public war, and yet assert that there is no such public war as is known to the law of nations.

That it is a civil war does not change the rule of the law of nations respecting those who carry it on.

Modern writers, and the settled usage of civilized states, including the United States, and the repeated decisions of their highest court, allow to each party in a civil war full participation in the rights of war; and among others, the right to cruise on the high seas against the commerce and property of its enemy. Vattel (Chitty's Ed.) 424; Wheat. Int. Law. pt. 2, c. 2, § 15; Halleck, Int. Law, 333; The Santissima Trinidad, 7 Wheat. [20 U. S.] 283; U. S. v. Palmer, 3 Wheat. [16 U. S.] 610; The Neustra Senora, 4 Wheat. [17 U. S.] 497.

The fact that it is a civil war, and a rebellion against the lawful government of the United States, renders a commission to cruise against the commerce of the United States, derived from the Confederate government, utterly void as an answer to an indictment for an offence against municipal criminal law; but the existence of such an authority, from such a government, prevents those acting under it from being pirates, under the law of nations.

The warranty by the assured, against "capture, seizure, and detention," and the consequences thereof, takes this loss out of the policy.

Any capture or seizure, whether rightful or wrongful, and whether made under a commission from a de jure, or de facto government, or made by mere pirates, is equally within this warranty. 2 Marsh. Ins. 422; 1 Phil. Ins. 1110; Emerig. Assur. c. 12, sect. 18, § 1; 3 Kent, Comm. 304; Poth. Ins. No. 54; Valin, Comm. arts. 26, 46; 2 Boulay-Paty, § 16, p. 102; Goss v. Withers, 2 Burrows, 694; Powell v. Hyde, 5 El. & Bl. 607; Kleinwort v. Shepard, 1 El. & El. 447; Id., 32 Law T. 313; McCargo v. New Orleans Ins. Co., 10 Rob. (La.) 202; McCargo v. Merchants' Ins. Co., Id. 334, 349; Tirrell v. Gage, 4 Allen, 245; Lee v. Boardman, 3 Mass. 238, 245; Abb. Shipp. 33; Halleck, Int. Law, c. 12, § 14; 1 Kent, Comm. 108; 2 Wood. Lect. 255; 2 Arn. Ins. 813, 1115–1117; The Hercules, 2 Dod. 359; The Helena. 4 C. Rob. Adm. 5; The Dickenson, 1 Hay & M. 46; Nesbitt v. Lushington, 4 Term R. 787; Naylor v. Palmer, 8 Exch. 739; Mellish v. Andrews, 15 East, 15; U. S. v. Klintock. 5 Wheat. [18 U. S.] 150; Davison v. Sealskins [Case No. 3,661]; Parsons v. Massachusetts F. & M. Ins. Co., 6 Mass. 208; The Wanderer [Case No. 17,139].

The 3d section of the act of March 3, 1819 [3 Stat. 513], enacted by the congress of the United States, reads as follows:

"And be it further enacted, that the commander and crew of any merchant vessel of the United States, owned wholly or in part by a citizen thereof, may oppose and defend against any aggression, search, restraint, depredation, or seizure, which shall be attempted upon such vessel, or upon any other vessel owned as aforesaid, by the commander or crew of any armed vessel whatsoever, not being a public armed vessel of some nation in amity with the United States; and may subdue and capture the same," &c.

By section 2, the president is authorized to cause to be subdued, &c., any armed vessel "which shall have attempted or committed any piratical aggression, search, restraint, depredation, or seizure." 3 Stat. 513.

By a Massachusetts colony law of 1673, piracy in harbors or at sea by piratically seizing a vessel, &c., was punished with death.

4 Mass. Col. Rec. pt. 2, p. 567; 7 Dane, Abr. 90. See The Malek Adhel, 2 How. [43 U. S.] 233; Josefa Segunda, 5 Wheat. [18 U. S.] 338, 353, 357; Dias v. The Revenge [Case No. 3,877]; U. S. v. Jones [Id. 15,494]; Holt, Shipp. 191.

It has been suggested by the plaintiffs, that the de facto Confederate States occupy the same position towards the United States that the latter occupied towards Great Britain in our war of the Revolution, and that our courts are to take the same view of questions growing out of the contest that the English courts then took of similar questions. During that war we find that the most eminent English jurist was accustomed to use the word "capture" to describe the acts of American privateers. Milles v. Fletcher, 1 Doug. 231. See Miller, Ins. 299; Tyrie v. Fletcher, 2 Cowp. 666.

Judge Nelson, in his charge to the jury upon the trial of the crew of the Savannah, gave the following definition of a pirate:—

"A pirate is said to be one who roves the sea in an armed vessel, without any commission from any sovereign state, on his own authority, and for the purpose of seizing by force, and appropriating to himself, without discrimination, every vessel he may meet."

There was no loss by fire within the meaning of the policy.

The hostile acts of the officers and crew of the Sumter were the efficient and prevailing cause of the loss and destruction of the vessel, and those acts were put at the risk of the owner by the marginal clauses, which warrant the insurer against loss or expense arising from capture.

The taking and the burning were parts of one and the same act of hostility; to attempt to separate them and consider them as distinct, independent, and unconnected perils or causes of loss, is a metaphysical refinement and subtlety which is contrary to the obvious truth of the case, and therefore has no place in the law of insurance.

The rule, "Causa proxima non remota spectatur," does not refer to the cause nearest in point of time, but to that which is most nearly and essentially connected with the loss as its efficient cause. Vos v. United Ins. Co., 2 Johns. Cas. 180; Suckley v. Delafield, 2 Caines, 222; American Ins. Co. v. Dunham, 12 Wend. 463; Havelock v. Hancill, 3 Term R. 277; Waters v. Merchants' Louisville Ins. Co., 11 Pet. [36 U. S.] 213, 219; Grim v. Phoenix Ins. Co., 13 Johns. 451; Montoya v. London Assur. Co., 4 Eng. Law & Eq. 500; Magoun v. N. E. Ins. Co. [Case No. 8,961]; Savage v. Pleasants, 5 Bin. 403; Coolidge v. New York Firemen Ins. Co., 14 Johns. 308.

These cases, and all the cases above cited, are put upon the ground, that all the consequences naturally flowing from the peril insured against, or incident thereto, are properly attributable to the peril itself; that a loss which may fairly be considered to be exclusively and solely occasioned by a peril insured against, without regard to distance of time, is a loss by that peril; that the loss is to be attributed to the efficient, predominating, operative peril. See, particularly, Waters v. Merchants' Louisville Ins. Co., 11 Pet. [36 U. S.] 219; Magoun v. New England Ins. Co. [Case No. 8,961]; Phil. Ins. pp. 655, 677, §§ 1115, 1132; Peters v. Warren Ins. Co., 14 Pet. [39 U. S.] 108; Montoya v. London Assur. Co., 4 Eng. Law & Eq. 500; McCargo v. New Orleans Ins. Co., 10 Rob. (La.) 327, 328; Lawrence v. Aberdein, 5 Barn. & Ald. 108.

It would be a mere metaphysical nicety to hold otherwise, and the law, as a practical science, does not indulge in such niceties; the law of insurance, like all commercial law, requires the application of sound common sense and practical reasoning, for it deals with the business and interests of common men, who are unused to deal with abstractions and refined distinctions. It has become a practical and convenient system, because it studiously avoids subtle and refined reasoning, however logical it may seem, and has guided itself by safe practical rules. Magoun v. New England Marine Ins. Co. [Case No. 8,961]; Peters v. Warren Ins. Co., 14 Pet. [39 U. S.] 108; General Mut. Ins. Co. v. Sherwood, 14 How. [55 U. S.] 363; Rhinelander v. Insurance Co., 4 Cranch [8 U. S.] 29.

The cases claimed as giving countenance, in this part of the case, to the theory of plaintiffs, resolve themselves into these classes:—

Cases where, after one peril has ceased to act, another independent and distinct peril, having no necessary or natural connection with the first, supervenes and causes the loss; in these, though the property might not have been exposed to the second peril, or might not have been so injuriously affected by it, without the concurrence of the first, the second is deemed in law to be, as it is in fact, the cause of the loss. See Jones v. Schmoll, 1 Term R. 130, note; Delano v. Bedford Ins. Co., 10 Mass. 353; Law v. Goddard, 12 Mass. 113; Livie v. Janson, 12 East, 653; Rice v. Homer, 12 Mass. 234; Forster v. Christie, 11 East, 205.

Another class embraces cases, where the underwriters have alleged that the negligence of the agents or servants of the assured, not amounting to barratry, led or contributed to the loss. Formerly it was held that the assured should not recover for losses to which his own negligence or that of those under his control had contributed. General Mut. Ins. Co. v. Sherwood, 14 How. [55 U. S.] 364.

There are some that turn on a question of pleading. Hagedorn v. Whitmore, 1 Starkie, 157; Gordon v. Rimmington, 1 Camp. 123.

The opinion of the supreme court of Massachusetts in this case furnishes a conclusive answer to the plaintiff's claim and argument on this point. Dole v. New England M. M. Ins. Co., 6 Allen, 395.

CLIFFORD, Circuit Justice. The defendants contend that the loss in this case, under the circumstances disclosed in the agreed statement, was not a loss by pirates within the meaning of the policy as understood in the law of insurance.

The theory of the defendants is, that the word "pirates" is used in the policy in the ordinary sense in which it is understood in the general commercial law of the civilized world; and they accordingly contend that the acts of the Sumter in taking the ship, having been committed when she was engaged in open and actual war, under a commission issued by a de facto government, as shown in the agreed statement, were not the acts of pirates, as assumed by the plaintiffs, but were the acts of persons having under the law of nations certain limited and qualified belligerent rights.

In the third place, they contend that the warranty in the marginal clause, against capture, seizure, and detention. or the consequences of any attempt thereat, takes the loss in this case out of the policy, and that any capture or seizure, whether rightful or wrongful, and whether made under a commission from a de jure or de facto government, or made by mere pirates, is equally within that provision.

Finally, they contend that the acts of the Sumter in taking the ship were the efficient and prevailing cause of the loss and destruction of the vessel, and that those acts were expressly put at the risk of the owner by the marginal clause.

The effect of the first proposition submitted by the plaintiffs, if admitted to be correct in its full extent, is the same as that of the third; and the two, therefore, in their application to this case, may be regarded as identical. Authorities cited by the plaintiffs in support of their first proposition show that the words "arrests, restraints, and detainments of kings, princes, and people, of what nation or quality soever," as a general rule, apply only to the acts of nations in their collective capacity; but they leave the question. whether the same rule shall be applied to the words "capture" and "seizure," quite undetermined, which is the question in this case. Stipulations of indemnity against takings at sea, arrests, restraints, and detainments of all kings, princes, and people, says Chancellor Kent, refer only to the acts of governments for government purposes, whether right or wrong; but the same learned author says that every species of capture, whether lawful or unlawful, and whether by friends or enemies, is also a loss within the policy. 3 Kent, Comm. 303. Speaking of the clause under consideration, Mr. Phillips says it is more generally understood to apply to captures, seizures, and detentions by the commissioned officers and agents of some lawful and acknowledged government, but he admits in the same section, that the word "capture" is of itself broad enough to comprehend any forcible seizure or arrest which may occasion a loss to the insured. 1 Phil. Ins. (4th Ed.) § 1110, p. 664. Capture, properly so called. says Arnould, is a taking by the enemy, as prize in time of open war, or by way of reprisals, and with intent to deprive the owner of all dominion or right of property over the thing taken; and no doubt is entertained that the word in legal acceptation is used in that sense more frequently than in any other. But the same author admits that the legality or illegality of the taking does not affect the liability of the underwriter as against the assured; and such, it is believed, is the well-settled law upon the subject. Whether lawful or unlawful, or however made, capture, when the proximate cause of the loss, renders the underwriter liable under a policy against such a loss, though other causes may have contributed to the result. 2 Arn. Ins. § 303, p. 808. When a vessel previously forced by stress of weather to put into a port of distress was violently boarded by a mob, who took the control of her from the master and crew, and ran her on a reef of rocks, whereby the cargo was damaged, and then forced the master to sell the cargo at a low price, Lord Kenyon held that the loss fell within a capture by pirates, and consequently that the assured might have recovered under a count so alleging it, had not the underwriters been exempted by the memorandum, from all average loss. Nesbitt v. Lushington, 4 Term R. 787; 2 Arn. Ins. § 306, p. 817. The usual phrase. "against all captures at sea, or arrests, restraints, or detentions of all kings, princes. or people," says Mr. Parsons, "covers captures, detentions, or arrests by public enemies, by belligerents, or in certain cases by the government of which the assured is himself a subject;" but he does not say that it does not also cover takings by pirates. 2 Pars. Mar. Law, 246. The remaining authority cited by the plaintiffs in support of their first proposition approaches more nearly to their views. Maude & P. Shipp. 232. Pirates, say those writers, are considered hostes humani generis, and therefore are never recognized as enemies, nor are they included in the expression "kings, princes, and people." Referring to that entire phrase. they remark that the words are properly applicable only to the ruling power of a country, and not to pirates or any other lawless power; but the only authority cited in support of the latter branch of the proposition is the case of Nesbitt v. Lushington, 4 Term R. 787, which is rather the other way. Plainly, therefore, the authorities cited are not sufficient to establish the proposition that the word "capture" is not broad enough to include the taking in this case; but the point will be further considered in examining the third proposition submitted by the plaintiffs.

The marginal clause, it is contended by the plaintiffs, is not a warranty in the sense in which that word is usually known and understood in the law of marine insurance.

The general rule is, that any statement of a fact in the policy is a warranty of that fact, though neither the word "warrant," nor any formal expression of like import is used. Such a formal expression is not in general requisite to constitute a warranty, as has been held in repeated cases. On the other hand, it is equally clear that there is frequently a warranty in form of expression, inserted in the policy or in the margin, where such is not the intention of the parties, and where there is none in fact. 2 Phil. Ins. (4th Ed.) § 760, p. 428. The instance put by Mr. Phillips is where the assured warrants the property free from average detention or capture, or from other losses or perils, which he well says is no more than an agreement that those shall not be among the perils and losses insured against, and for which the underwriter is to be liable. Palmer v. Warren Ins. Co. [Case No. 10,698]; Martin v. Fishing Ins. Co., 20 Pick. 389. The legal construction of the clause is that the underwriter is liable for the direct effects of the perils insured against, while the assured stipulates to bear the direct effect of those perils which are excepted. 1 Phil. Ins. (4th Ed.) § 2151, p. 708; McCargo v. New Orleans Ins. Co., 10 Rob. (La.) 313. Granting the correctness of the proposition, it is not perceived that it affords much assistance in disposing of the controversy, because the other questions remain to be determined.

The third proposition of plaintiffs is, that the loss in this case having arisen from a taking by rebels on the high seas is a loss by pirates, and not one arising from capture or seizure within the meaning of the policy. Obviously, there are two questions involved in the proposition, and it may well be admitted that they are important, and that neither is unattended with difficulty. They are as follows: 1. Whether the acts of the officers and crew of the Sumter in the taking the ship under the circumstances set forth in the agreed statement were piratical acts within the meaning of the policy; and if so, then, 2. Whether the meaning of the words "capture or seizure" is or is not broad enough to include the taking by pirates. Standard writers upon criminal law in defining piracy say it "consists in committing those acts of robbery and depredation upon the high seas which, if committed on land, would have there amounted to felony." 1 Russ. Crimes (Shars. Ed.) 94; 2 Whart. Cr. Law (5th Ed.) § 2830, p. 541; 4 Bl. Comm. 72; 2 East. P. C. 796; 1 Hawk. P. C. c. 37, § 4.

Punishment of death is denounced against any person, by the act of congress of the 3d of March, 1819, who shall, upon the high seas, commit the crime of piracy as defined by the law of nations. 3 Stat. 513. The supreme court held, in the case of an indictment under the fifth section of that act, that the definition given of piracy was a constitutional one, and that the crime was defined by the writers on the law of nations with reasonable certainty. U. S. v. Smith, 5 Wheat. [18 U. S.] 159. All writers, say the court, in that case, concur in holding that robbery or forcible depredation upon the sea, animo furandi, is piracy. Judge Story gave the opinion in that case, and he proceeds to say that the same doctrine is held by all the great writers on maritime law in terms that admit of no reasonable doubt; and he further shows that the common law, as it existed at the date of the Revolution, recognized and punished piracy as an offense not against its own municipal code, but as an offence against the law of nations, which is a part of the common law. Until the statute of 28 Henry VIII. c. 15, piracy was punishable in the parent country, only in the admiralty as a civil-law offence; and it is well-settled law that that statute, in changing the jurisdiction to the courts of common law, made no change in the nature of the offence. Robbery on the high seas, say the same court in U. S. v. Pirates, 5 Wheat. [18 U. S.] 197, is considered as an offence within the criminal jurisdiction of all nations. The reason of the rule undoubtedly is, that it is an offence against all nations, and consequently is punishable by all; and there can be no doubt that the plea of autre fois acquit is a good plea in any civilized nation, though resting on a prosecution instituted in the courts of a foreign jurisdiction. Modern writers also, upon the law of nations, maintain the same views. Piracy is robbery, says Chancellor Kent, or a forcible depredation on the high seas without lawful authority, when done animo furandi, and in the spirit and intention of universal hostility. His definition is that it is the same offence at sea as robbery on land; and he remarks that all writers on the law of nations and on the maritime law agree in that definition. Every nation has a right to attack and exterminate pirates without any declaration of war; and the universal rule is that they acquire no rights by capture, but that the true owner may reclaim his property wherever it may be found. 1 Kent, Comm. 184. Another modern writer upon international law says piracy is a crime not against any particular state, but against all states and the established order of the world. Wools. Int. Law, § 137, p. 232. The same learned author defines piracy as robbery on the sea or by descent from the sea upon the coast, as committed by persons not holding a commission from or at the time pertaining to any established state. He mentions three classes of persons whose depredations upon the sea amount to the crime under consideration: 1. Depredations of persons who form an organization for the purposes of such plunder, but who, inasmuch as such a body is not constituted for political purposes, cannot be said to be a body politic. 2. Acts of persons who having, in defiance of law, seized possession of a chartered vessel, use it for the purpose of robbery. 3. Similar acts

of persons who have taken and hold commissions from two belligerent adversaries. Such a crime being one committed against all nations, may be brought before the proper tribunal of any civilized nation, no matter what may be the nationality of the prosecutor or what may be the origin or domicile of the person committing the offence. The legislative authority of a state may doubtless enlarge the definition of the crime of piracy, but the state must confine the operation of the new definition to its own citizens and to foreigners on its own vessels. Two states also may agree by treaty to regard as piracy a particular crime which is not so defined in the international code, and the stipulation will be obligatory upon the contracting parties. The effect of such a treaty is in general to give to both the contracting parties jurisdiction over that offence for the trial and punishment of such of the citizens of the two countries as commit the offence, but the operation of such a treaty has no bearing on other nations. Wools. Int. Law, § 137, p. 233.

Actual robbery on the high seas is piracy under the law of nations by all the authorities, and so also is the act of cruising upon the high seas without a commission and with the intent to rob, especially if the charge be accompanied by proof of unsuccessful attempts about the same time to commit the primary offence. Such robbery is piracy, because the criminal act is committed against all nations, and therefore is punishable by all. Undoubtedly a statute may declare any offence piracy committed within the jurisdiction of the nation passing the statute, and such offence will be punishable by that nation as an offence against the municipal authority. But piracy under the law of nations, which alone is punishable by all nations, can only consist in an act which is an offence against all. No particular nation can increase or diminish the list of offences thus punishable. Append. 5 Wheat. [18 U. S.] 8, per Marshall, C. J. The offence of piracy at common law, says Mr. Roscoe, is nothing more than robbery upon the high seas; but by statutes passed at various times, and still in force, many artificial offences have been created which are to be deemed to amount to piracy, and the remark is undeniably correct, if applied exclusively to the municipal law of the nation where such statutes were passed and are in force. Rosc. Cr. Ev. (Shars. Ed.) 832; U. S. v. Palmer, 3 Wheat. [16 U. S.] 626. The controlling purpose of such municipal laws is to denounce certain acts as piracy not before known as such, and to make provision for the trial and punishment of such offenders, as if the acts committed were piracy at common law.

Offenders against such laws, if citizens or subjects of the nation passing the laws, are justly amenable to their penalties, as violators of the municipal law of the nation. Text-writers, says Mr. Wheaton, define piracy as "the offence of depredating on the seas without being authorized by any sovereign state or from commissions from different sovereigns at war with each other." Wheat. Int. Law, by Lawrence (2d Ed.) 246. The annotator shows conclusively that in applying the term "piracy" regard has not always been had to the distinction between the offence as known in the law of nations, which is justiciable everywhere, and certain offences created by the statutes of particular nations, for which the same nomenclature has been arbitrarily adopted, but which are only cognizable before the municipal tribunals of such nations having jurisdiction either territorial, actual, or implied, or over the person of the offender. Id. 247. The proposition that pirates are the common enemies of all mankind must be confined to piracy as defined by the law of nations, and cannot be extended to offences which are made piracy by municipal legislation. The former offence may be tried and punished in the courts of justice of any nation by whomsoever and wheresoever committed; but piracy created by municipal statute can only be tried by that state within whose territorial jurisdiction, on board of whose vessels, the offence thus created was committed. Id. 256; U. S. v. Klintock, 5 Wheat. [18 U. S.] 144. Similar views also are expressed by Mr. Phillimore in his very learned commentaries upon international law. He says piracy is an assault upon vessels navigating the high seas, committed animo furandi, whether the robbery or forcible depredation be effected or not, and whether or not it be accompanied by murder or personal injury. Courts of all nations have jurisdiction of the offence, or in other words, the pirate is "justiciable everywhere;" and the learned commentator remarks, that the detestable occupation of the pirate has made him hostis humani generis, and that he cannot upon any ground claim immunity from the tribunal of his captor. 1 Phillim. Int. Law, 379. Contracts of marine insurance, however, have in general no connection with criminal procedure, or with the laws of a state making provision for the punishment of offenders. The interpretation and effect of marine policies of insurance must be governed by the rules of the commercial law, which is a system of law known to all nations, and which in general is wholly unaffected by the criminal law of any particular country. Warren v. Manufacturers' Ins. Co., 13 Pick. 518; Deshon v. Merchants' Ins. Co., 11 Metc. [Mass.] 199. Treating of marine insurance, a learned commentator says that maritime law in general partakes more of the character of international law than any other branch of jurisprudence; and the reason assigned for the conclusion is, that it pervades everywhere the institutions of that vast combination of civilized nations, which constitute one community for commercial purposes and social intercourse. 3 Kent. Comm. 342; The Antelope, 10 Wheat. [23 U. S.] 122. No branch of the law, says Mr. Phillips, can more proper-

ly be denominated a science than insurance; and he holds in effect that the decisions of the courts of other countries, and the opinions and reasons of foreign writers upon the subject are equally applicable to it with those of our own courts, because the contract is everywhere known and is substantially the same throughout the civilized world. Phil. Ins. (pref.) vii; The Malek Adhel, 2 How. [43 U. S.] 233; U. S. v. Smith, 5 Wheat. [18 U. S.] 162.

The defendants insist that a capture made under a commission to cruise against its enemies, and its enemies only, issued under a regularly organized de facto government, engaged in open and actual war, is not piracy under the law of nations. But they do not controvert the fact that such a commission, derived from the Confederate States under the circumstances disclosed in the agreed statement, would be utterly null and void as an answer to an indictment for an offence against our municipal criminal law. Such a proposition, if submitted, could not, in the judgment of this court, be maintained for a moment, as it would involve the question whether those states had a right to secede. They had no such right express or implied. Secession is a wicked heresy, which has no foundation whatever in the federal constitution. Nothing of the kind is pretended by the defendants; but what they contend is, that the exercise of such an assumed authority under such a government as that disclosed in the agreed statement, prevents those acting under it from being pirates under the law of nations. The commission in this case was to attack, capture, or destroy American vessels, and none others; and the agreed statement shows that the attack, capture, and destruction of the ship was by the described persons, acting by virtue of such commission, and under the assumed authority of such Confederate States. The concession of the defendants is, that the facts stated would constitute no defence to an indictment alleging an offence against our municipal criminal law; and they also concede affirmatively that the United States have, in respect to the government and people of the so-called Confederate States, sovereign as well as municipal rights; that under the first they may wage war to suppress the rebellion, and that under the second they may hold persons engaged in it subject to the criminal laws of the United States. Rose v. Himely, 4 Cranch [8 U. S.] 272; Halleck, Int. Law, 344. Granting all this, still they insist that the existence of such criminal laws, and the illegality of the acts of the Confederate States and people, when tested by such laws, have no bearing whatever on the question, whether in the case under consideration the law of nations has been infringed. The Antelope, 10 Wheat. [23 U. S.] 122; The Marianna Flora, 11 Wheat. [24 U. S.] 1. Such a question came before the supreme court under the following circumstances. U. S. v. Klintock, 5 Wheat.

[18 U. S.] 151. The statement of the case shows that in the trial of an indictment for piracy, it appeared that the defendant had been cruising on the high seas under a commission from a person having no authority to issue commissions for the capture of vessels at sea; that the defendant, as first lieutenant of the vessel in which he sailed, aided in capturing the vessel described in the indictment. The defence, among other things, was that the acts proved did not amount to piracy, because the defendant had acted in good faith under the commission. The answer of Marshall, C. J., to that proposition deserves consideration. He said whether a person acting in good faith under such a commission may or may not be guilty of piracy, we are all of the opinion that the commission can be no justification of the facts stated in this case. The decision turned wholly on the fact stated by the court, that the whole transaction, taken together, demonstrated that the vessel had not been captured jure belli, but was seized and carried into port animo furandi; that it was not a belligerent capture, but a robbery on the high seas, which, by all the authorities, is piracy under the law of nations. Unlike what was stated in that case, the agreed statement in this case shows that the capture of the ship was for the purpose of prosecuting said war so declared to exist, and with the sole purpose and intent of coercing the government of the United States, as before explained.

The policy in this case was executed, and the contract was completed, as the parties agree, previous to the president's proclamation establishing the existing blockade; and it also appears that since the beginning of hostilities our public armed ships have claimed and exercised the right to visit neutral ships on the ocean, and that many such have been captured, and with their cargoes condemned for having contraband of war on board destined to some port in the control of the rebels. Property also belonging to persons resident in any place in the possession and control of the rebels, and found on the high seas, has been, pursuant to the orders of the president, captured and condemned as lawful prize of war, upon the ground that it was enemies' property. Looking at the whole case, it is evident that the question under consideration has been fully settled by the supreme court. The Amy Warwick, 2 Black [67 U. S.] 665. Neutrals, say the court in that case, have a right to challenge the existence of a blockade, de facto, and also the authority of the party exercising the right to institute it. They have a right to enter the ports of a friendly nation for the purposes of trade and commerce, but are bound to recognize the rights of a belligerent engaged in actual war, to use this mode of coercion for the purpose of subduing the enemy.

Right of prize and capture has its origin, say the court, in the jus belli, and is gov-

erned and adjudged under the law of nations. To legitimate the capture of a neutral vessel or property on the high seas, a war must exist de facto, and the neutral must have a knowledge or notice of the intention of one of the parties belligerent to use this mode of coercion against property or territory in possession of the other. Parties belligerent in a public war are independent nations. But it is not necessary to constitute war, say the court, that both parties should be acknowledged as independent nations or sovereign states; and the court added that a war may exist where one of the belligerents claims sovereign rights against the other. "When the party" in a civil war "occupy and hold in a hostile manner a certain portion of territory, have declared their independence, have cast off their allegiance, have organized armies, have commenced hostilities against their former sovereign, the world acknowledges them as belligerents, and the contest a war." They claim to be in arms to establish their liberty and independence in order to become a sovereign state, while the sovereign party treats them as insurgents and rebels who owe allegiance, and who should be punished with death for their treason. Parties to a civil war, say the court, usually concede to each other belligerent rights. They exchange prisoners, and adopt the other customs and rules common to public international wars. The true test of the existence of civil war, say the court, as found in the writings of the sages of the common law, may be thus summarily stated:—

When the regular course of public justice is interrupted by revolt, rebellion, or insurrection, so that the courts of justice cannot be kept open, civil war exists, and hostilities may be prosecuted on the same footing as if those opposed to the government were foreign nations invading the land. The court expressly say in that case that it is not necessary that the independence of the revolted province or state should be acknowledged in order to constitute it a party belligerent in a war according to the law of nations. Reference is then made to the fact that the queen of England, on the 13th of May, 1861, issued her proclamation of neutrality, recognizing hostilities as existing between the United States and the so-styled Confederate States; and then the court say that after such an official recognition by the sovereign, a citizen of such foreign state is estopped to deny the existence of a war with all the consequences as regards neutrals. Congress recognized the existence of war on the 13th of July, 1861; and the minority of the court held that a civil territorial war in the international sense did not exist until that act of congress was passed. Two answers were made by the court to that objection: 1. That a prior declaration of war was not necessary to constitute that relation; and, 2. If it was, that the subsequent acts of congress had a retroactive effect, and operated to cure the defect. A minority of the court denied that the acts of congress would have any such operation; and the majority of the court, in replying to that objection, admit that it might possibly have some weight in the trial of an indictment in a criminal court, but say that precedents from that source cannot be received as authoritative in a tribunal administering public and international law, which is undoubtedly correct. The conclusion is that the president had a right, jure belli, to institute a blockade of the ports in possession of the states in rebellion which neutrals were bound to regard. The next question in the case was, whether the property of all persons residing within the territory of the states in rebellion, if captured on the high seas, was to be treated as enemies' property, irrespective of the question whether the owner was or was not in arms against the government. Responding to that inquiry, the court say that all persons within that territory whose property may be used to increase the resources of the hostile power, are in the contest liable to be treated as enemies, though not foreigners. They have cast off their allegiance, and made war on their government, and are none the less enemies because they are traitors. The produce of the hostile territory, say the court, as well as other property engaged in the commerce of the hostile power, as the source of its wealth and strength are always regarded as legitimate prize without regard to the domicile of the owner, and much more so if he resides and trades within their territory. The supreme court, therefore, has decided that the present civil war is of such a character and magnitude as to give to the United States the same rights and powers which they might exercise in the case of a national or foreign war; that they have a right, jure belli, to institute a blockade of any ports in the rebellious states; that the proclamation of blockade was of itself conclusive evidence that a state of war existed which authorized and demanded such a measure, and that it made all persons residing in the territory liable to be treated as enemies, though not foreigners. Such conclusions are utterly irreconcilable with the proposition, that the taking of the ship in this case, under the circumstances described in the agreed statement, was a taking by pirates, as contended by the plaintiffs. The same views have also been expressed by the supreme court of Massachusetts in this very case, as may be seen by referring to the very able opinion of the court pronounced by the present chief justice. Dole v. New England M. M. Ins. Co., 6 Allen, 392. The opinion of the court was that it could not be maintained on the facts offered in proof, which were substantially the same as those agreed in this case, that the persons who seized and burned the ship were to be regarded as pirates within the ordinary signification of that word as used in the law of na-

tions, or as commonly understood and applied in maritime contracts and adventures. They were not common robbers and plunderers on the high seas. Continuing, the court go on to show that their acts were unlawful, and such as cannot be justified in our courts, but say, that on the facts offered to be proved, it appeared that they sailed under a commission issued by a government de facto claiming to exercise sovereign powers, and to be authorized to clothe their officers and agents with the rights of belligerents, and to send out armed cruisers for the purpose of taking enemy's vessels jure belli. Facts offered to be proved further showed, say the court, that "this de facto government had proceeded to raise armies. and had put them into the field, by which an actual state of war was created." Referring to those additional facts the court say, in this state of the case. it would be going very far to say that the taking of a vessel by an armed cruiser by such de facto government cannot properly be designated as a capture. Indeed, such an interpretation, say the court, would limit the meaning of the word as applied in mercantile contracts, to acts of forcible taking of ships or vessels on the high seas by duly established and recognized governments, acting according to the laws of war. and would exclude all such acts if unlawful or unjustifiable, or contrary to the municipal law of the country in which the contract was made, and to be performed. although done under an authority purporting to come from a government de facto engaged in actual war, and claiming to exercise belligerent rights. The decision of the cause, however, was not placed entirely upon that ground; but the court also held that the word "capture" was broad enough to include the taking in this case, even though the officers and crew of the steamer were regarded as pirates in the international sense. Suit was also commenced in the supreme court of Maine upon another policy on this same vessel for the same loss. Parties to that suit are Dole v. Merchants' M. M. Ins. Co. [51 Me. 465], and the opinion was given by Davis, J. He places the decision upon the second ground assumed by the supreme court of Massachusetts; but he admits that the decision might perhaps have been based upon a different ground. He goes on to say that war in fact existed' at the time of the loss. Hostile forces were arrayed against each other in actual conflict. Its existence would not have been more palpable or real if it had been recognized by any legislative action, and though it was a civil war, the taking was not the less a capture for that reason.

The decision of the tribunal of commerce of Marseilles is to the same effect. 1 Lemonier, 251; Journal de Jurisprudence Commercial et Maritime de MM. Girod et Clariond, T. V.. 235. Use will be made of the translation furnished at the argument. as it is believed to be correct. The case as stated shows that insurance was caused to be made in behalf of the owner of a certain amount of specie, laden on board a certain brig. The policy warranted the underwriters free from all casualties of war. hostilities, or reprisals by any maritime power whatsoever. The agent of the owners of the specie subsequently caused insurance to be effected by other underwriters, and solely against risks of war. The vessel sailed and loss occurred, and the master made a protest, from which it appeared that the brig was met by a privateer of Colombia, arrested and carried to Cumana, where the capture of the cargo was declared lawful, because a part was recognized as Spanish property, and the neutrality of the remainder was not sufficiently proved. Said agents of the owners of the specie afterwards made an abandonment to the underwriters who had assumed the risks of the sea, and also to the underwriters who had assumed the risks of war. The underwriters agreed, in their defence, that the abandonment was not valid upon several grounds not material to the present investigation, but they were divided on the question who ought to pay the loss in case the abandonment should be held valid. Those first mentioned maintained that the capture was a casualty of war, and therefore that the loss was not at their expense. The second underwriters contended that the capture could not constitute an act of war or of hostility arising on the part of a recognized maritime power, and consequently that the case came within the class of ordinary risks of the sea, piracies, aggressions. and the like, which were not assumed by them. The judgment given is too elaborate to be reproduced. The questions as stated are as follows: 1. Whether the capture made by the armed cruiser could be likened to acts of piracy. 2. Whether the loss ought to be considered a casualty of war or of the sea. The conclusions were: 1. That revolted colonies, established as a de facto government, were not to be considered as pirates under the circumstances, which showed that they only attacked the flag and property of the mother country, and respected the flag and property of other powers. 2. That the underwriter who insured against the risk of war was liable. and that the warranty took the risk out of the other policy.

War having been recognized as existing between Spain and her colonies by our government, the supreme court of the United States held that it was the duty of the federal courts. when a capture was made by either of the belligerent parties, without any violation of our neutrality. and the captured prize was brought innocently within our jurisdiction. to leave the property in the same condition as they found it, or to restore the same to the state from which it had been forcibly removed by the act of our own citizens. The Neustra Senora. 4 Wheat. [17 U. S.] 497. The colonies of Spain during the existence of war

between them and the parent country, and before the existence of the war had been recognized by the United States, were deemed by our government as belligerent nations, and entitled to all the rights of war as against the enemy. The Trinidad, 7 Wheat. [20 U. S.] 337. Judge Story said, in U. S. v. The Malek Adhel, 2 How. [43 U. S.] 232, that a pirate is deemed, and properly deemed, hostis humani generis, because he commits hostilities upon the subjects and property of all nations without any regard to right or duty, or any pretence of public authority. The evidence in this case shows no such state of the case, nor any pretence that the act of taking was committed animo furandi, as all the commentators agree that it must be, in order to amount to evidence of piracy as understood in the law of nations. Certain old writers upon the law of nations regarded a civil war as public on the side of the established government, and private on the part of the people resisting its authority; but Mr. Wheaton says that the general usage of nations regards such a war as entitling both the contending parties to all the rights of war as against each other, and even as respects neutral nations. Wheat. Int. Law, by Lawrence (Ed. 1863) 522, and note 171; Vattel, bk. 3, c. 18, p. 424. International law, says Woolsey, comes in contact with internal wars so far as the laws of war, that is, of humanity and natural justice, are concerned, and also in the bearings of the war upon the interests and rights of foreign states. The same rules of war are followed in such a war, says the same author, as in any other—the same ways of fighting, the same treatment of prisoners, of combatants, of noncombatants, and of private property by the army where it passes. Nations thus treating rebels by no means, however, concede thereby that they form a state or have the remotest claim to such a concession. Wools. Int. Law (2d Ed.) § 136, p. 231; Halleck, Int. Law, 333; Davison v. Sealskins [Case No. 3,661]; 6 Webst. Works, 256, 257; U. S. v. Baker, Warb. 370. For these reasons I am of the opinion that the taking of the ship in this case, under the circumstances disclosed in the agreed statement, was not a taking by pirates, as understood in the law of nations or within the meaning of the policy.

Suppose it were otherwise, however, still the question remains to be considered whether the meaning of the words "capture or seizure" is or is not broad enough to include a taking by pirates under the circumstances disclosed in the agreed statement. The supreme court of Massachusetts held, in the case of Dole v. New England M. M. Ins. Co., before cited, that the word "capture," as applied to the contract of insurance, was broad enough to include within the exception in the policy a taking by pirates in the most enlarged sense in which that term is used; that is, a taking by common depredators and plunderers who do not merely make war on the vessels of a particular country, or seek to destroy or take forcible possession of the property only of the citizens of any one nation or government, but who commit robbery and pillage upon all persons and property found on the high seas lucri causa, and who may therefore properly be designated as hostes humani generis. Since that opinion was delivered, the same question has been very thoroughly examined in the case before mentioned, by Davis, J., as the organ of the supreme court of Maine. Suffice it to say, that the court, after a careful revision of the authorities, came to the conclusion that the word "capture" was broad enough to include a taking by pirates, and held that the plaintiffs were not entitled to recover. Those two learned judges have examined most of the authorities referred to on this point, in the argument of this case. A repetition of those citations is unnecessary, as they are as open to scrutiny in those opinions, as they would be if made the subject of further comment. Exception may well be made to two or three of the cases, as it may be that the volumes in which they are contained were not accessible at the time those opinions were prepared. Comment will first be made upon the case of Kleinwort v. Shepard, 1 El. & El. 447, because it must hereafter be regarded as a leading case upon the subject. The declaration was on a voyage policy from Macao to Havana, "warranted free from capture and seizure and the consequences of any attempt thereat." The policy contained the usual clause stating the perils insured against, which included "enemies, pirates, robbers, thieves, reprisals, takings at sea, and barratry of the master and mariners." Insurance was declared to be on a certain sum expended in provisions for the use of Chinese emigrants, and in advances on freights. The emigrants assaulted the master and crew, and took, stole, and carried away the ship. The defence was, that a forcible taking possession of the ship in the manner stated was a seizure within the meaning of the warranty. Judgment was delivered by Lord Campbell, C. J. He said it became necessary for the plaintiff to show that the word "seizure" was used in the warranty in some peculiar and restricted sense; and he admitted that it was sometimes introduced into policies where there was an apprehension of war, with the view to protect the underwriter, and to make him content with a peace premium.

But when it was introduced, the learned judge said there was no decision that it must be confined to belligerent seizure; and he added, that "we clearly think it would extend to captures and seizures by pirates." Exactly the same point was ruled by the same court in Powell v. Hyde, 5 El. & Bl. 607; and the ruling was the same way. The ruling was, that the exception introduced by the warranty was not confined to legal cap-

ture or seizure, but that an illegal capture or seizure was also within both the exception and the perils enumerated in the policy. Case of McCargo v. New Orleans Ins. Co., 10 Rob. (La.) 334, is to the same effect. Naylor v. Palmer, 8 Exch. 750; Mellish v. Andrews, 15 East, 15. Brief reference will also be made to some of the continental writers, as translations were furnished at the argument which are believed to be correct. Ordonnance of 1681 upon this subject is as follows:—

Insurers are to bear all losses " . . . . from pillage, captures (prises), arrests of princes, declarations of war, reprisals, and generally all other perils of the sea." Pothier, De Contr. d'Ass. 49, p. 68. The insurer is liable whether the capture was lawful or unlawful according to the laws of war, whether it was an act of hostility or brigandage; for however suffered, it is a peril of the sea, and the insurers are liable for all perils of the sea. 54, p. 79.

"Assured may abandon," says Valin, "only in cases of capture (prises), shipwreck," &c. Article 46 of Ordonnance.

Referring to that article the commentator says: "In the first case, that of capture, it is immaterial whether the capture be legal or illegal; neither this article nor article 26 (above cited) makes any distinction, and in both cases it is a peril of the sea."

The commentator then cites an opinion prepared by Emerigon, upon the distinction between a capture and an "arrest of princes." Page 121. "A capture," he says, "is when a vessel is taken as prize of war in a spirit of depredation, with a design to deprive the owner of it."

It is either lawful or unlawful; lawful when made by a declared enemy, and according to the laws of war; unlawful when made by a pirate, a friend, or a neutral, or contrary to the law of nations. But whether the capture be lawful or unlawful the insurers are liable. This word "capture" as used in the ordonnance, without any qualification, must be taken in a general sense, and as including all captures, lawful and unlawful, for both generally lead to the same result.

The Roman law enumerates among the perils the attacks of enemies, hostium incursus.

"Whether the capture be lawful or unlawful, the insurers are none the less responsible. They insure, not only against captures made by enemies or pirates, but also against such as are improperly made by friends, allies or neutrals; in a word, against all captures in the way of hostilities, brigandage, or otherwise. Whoever commits depredations, says Targa, is a corsair, and becomes an enemy." 2 Boulay-Paty, p. 102.

Taken together, the authorities cited support the views of Mr. Marshall, in his treatise on the law of marine insurance. He says that capture is where a ship is subdued and taken by enemies in open war, or by way of reprisals, or by pirates, and with intent to deprive the owner of it. Marsh. Ins. 422. The weight of authority is adverse to the views of the plaintiffs; and in the judgment of this court the meaning of the word "capture" is broad enough to include a taking by pirates.

The fourth proposition of the plaintiffs is, that it is not the taking of the ship, as set forth in the agreed statement, but the fire which was the proximate cause of the loss described in the declaration. The facts are that the ship was boarded "with a force which her officers and crew were unable and did not attempt to resist. The assailing force plundered her of her papers, some sails, spars, provisions and other articles, and took out her officers and crew; and after her officers and crew had been taken out of her, she was set on fire by those who took her, and was thereby totally destroyed." The rule is, that where different causes concur, to one of which it is necessary to attribute the loss, it is to be attributed to the efficient predominating peril, whether it is or not in activity at the consummation of the disaster. 1 Phil. Ins. § 1132. The argument for the plaintiffs is, that the fire not having been a means used in taking possession of the ship, but having occurred after the taking was complete, and after her assailants had obtained undisputed possession of her and taken out her officers and crew, was the proximate and efficient cause, and by law the sole cause, of her loss. They deduce that conclusion by virtue of the maxim, "causa proxima non remota spectatur," and by virtue of the assumed theory that the fire was a separate and distinct peril from the capture. But the defendants contend that the hostile acts of the officers and crew of the Sumter were the efficient and prevailing cause of the loss and destruction of the vessel, and that the taking and the burning were parts of one and the same act of hostility.

The agreed statement shows that the steamer was cruising under a commission to attack, capture, or destroy the vessels belonging to the government and citizens of the United States, and none others. Semmes had such a commission, and the agreed statement shows that he was prevented from taking the ship into a port of the Confederate States by the danger and difficulty of our blockade. The clear inference, therefore, from the agreed facts is, that the capture was made for the purpose of destroying the vessel. The design and intent of the capture, as agreed by the parties, was to coerce the government of the United States to acknowledge the independence of said Confederate States. The danger and difficulty of taking the ship into port deterred the captor from making the attempt. Nothing else remained for him to do, consistent with the purpose for which he was cruising, but to attack and destroy the vessel. The attack

was made for the purpose of destroying the vessel; and under such circumstances it must be apparent that the capture and burning were parts of one and the same act of hostility. The maxim, "causa proxima non remota spectatur," is a rule in the law of insurance, but it does not necessarily refer to the cause nearest in point of time to the loss. But the true meaning of that maxim is, that it refers to that cause which is most nearly and essentially connected with the loss as its efficient cause. Case of Magoun v. New England Marine Ins. Co. [Case No. 8,961] is a direct adjudication to that effect. All the consequences, said Judge Story in that case, naturally flowing from the peril insured against or incident thereto, are properly attributable to the peril itself. If there be a capture, and before the vessel is delivered from that peril, she is afterwards lost by fire or accident, or negligence of the captors, it would be clear, said that learned judge, that the whole loss is properly attributable to the capture. The law of insurance does not indulge in unsubstantial distinctions. On the contrary, it seeks to administer justice according to the fair interpretation of the intentions of the parties, and deems that to be a loss within the policy which is a natural consequence of the perils insured against. Peters v. Warren Ins. Co., 14 Pet. [39 U. S.] 109. The loss in this case was the natural effect of the capture, and under the facts disclosed in the agreed statement, it may be regarded as the inevitable consequence of the hostile seizure. Such losses are held by all the writers as fairly attributable to the original taking. Coolidge v. New York Firemen Ins. Co., 14 Johns. 316; Savage v. Pleasants, 5 Bin. 411. Where the master, in violation of his duty, wilfully undertook to run a blockade, or to engage in illicit trade, and was captured, barratry, and not capture, was held to be the cause of the loss in determining whether it shall be borne by the underwriter who takes the risk of capture, but does not insure against barratry. American Ins. Co. v. Dunham, 12 Wend. 463; Id., 15 Wend. 11; Suckley v. Delafield, 2 Caines, 222; Havelock v. Hancill, 3 Term R. 277. Cases undoubtedly arise, where, after one peril has ceased to act, another independent and distinct peril, having no necessary or natural connection with the first, supervenes and causes the loss: and in that class of cases, though it be true that the vessel might not have been exposed to the second peril, or might not have been so injuriously affected by it without the concurrence of the first, the second is deemed to be in law, as it is in fact, the cause of loss. Jones v. Schmoll, 1 Term R. 130, note; Delano v. Bedford Ins. Co., 10 Mass. 353; Law v. Goddard; 12 Mass. 113.

Several cases also are cited, where a peril insured against, put the vessel in such a position that she was acted upon by another peril, distinct in its origin and character, and which was not insured against; but it is not perceived that such cases can have any bearing upon the question before the court. Livie v. Janson, 12 East, 653; Rice v. Homer, 12 Mass. 234. But where a fire arose from the barratry of the master or crew, it was held that the loss was by barratry, and was not chargeable to an insurer who insures against fire, but not against barratry. Waters v. Merchants' Louisville Ins. Co., 11 Pet. [36 U. S.] 219; Grim v. Phoenix Ins. Co., 13 Johns. 457. So where the vessel was sunk by a shot fired from a battery, the loss was held not to be by sinking, but by the hostile act of the soldiers, and therefore within a waranty against capture and seizure, like the one in this case. Powell v. Hyde, 5 El. & Bl. 607.

Defendants also refer to the case of Naylor v. Palmer, 8 Exch. 739, which is a leading case. Insurance was on advances to be repaid on the safe arrival of certain emigrants at their port of destination. They seized the vessel on the voyage, compelled the crew to work her to another port, and there, without doing any injury to the vessel, left her. The claim was, that their failure to arrive, and the consequent loss was owing to the unwillingness of the emigrants to proceed; but the court held that the proximate and efficient cause was the seizure, and that the loss was total. See, also, General Ins. Co. v. Sherwood, 14 How. [55 U. S.] 364, 367.

The present case, however, does not depend upon any very critical application of the doctrine deducible from the maxim under consideration, because the agreed statement shows that the capture and burning were parts of one and the same acts of hostility. Looking at the whole case, it is clear that the plaintiffs cannot recover, and there must be judgment for the defendants.