CHARLES E. DOLE *& al. versus* MERCHANTS' MUTUAL
MARINE INSURANCE CO.

When a portion of the subjects of a civil government have rebelled, established another government, and resorted to arms to maintain it, and the rebellion is of such magnitude that the military and naval forces have been called out to suppress it, the fact that such rebels are robbers on the land, and pirates on the sea, does not preclude them from being regarded as belligerents.

Dole *v.* Merchants' Mutual Marine Insurance Co.

The seizure and destruction of a merchant vessel by such rebels, on the high seas, is within the terms of a warranty in the margin of a policy of insurance, by which the risk of "capture, seizure, or detention," is excepted from the perils insured against.

REPORTED from *Nisi Prius*, APPLETON, J., presiding.

ASSUMPSIT on a policy of insurance on the plaintiffs' ship, *Golden Rocket,* — insuring thereon the sum of $5000.

*Horace Gray, jr., R. H. Dana, jr.,* and *John A. Peters,* for plaintiffs.

*B. R. Curtis* and *J. S. Rowe,* for defendants.

The facts in the case sufficiently appear in the opinion of the Court, which was drawn by

DAVIS, J. — This is a suit upon a policy of insurance, on the ship Golden Rocket, for one year, commencing November 19, 1860.   On the trial, it was proved that the ship was taken July 3, 1861, by the steamer Sumter, Captain Semmes, who claimed her as a prize.   He and his officers and crew stripped the ship of her sails and spars, took her provisions and stores, and then set her on fire, by which she was destroyed.   The title of the plaintiffs, due notice of the loss, and demand of payment therefor, were admitted.

In defence, the company offered to prove that Semmes was duly commissioned as Captain in the Navy of the Confederate States, and was acting under the authority thereof; that said States had seceded from the United States, and had organized an independent government; and that they were, at the time of the loss, carrying on hostilities against the United States.   This evidence was excluded.

The case was then submitted to the Court, and a default was entered, to be taken off if the action is not maintainable, or if the evidence excluded should have been admitted.

The insurance was against " perils of the seas, *enemies, pirates,* assailing thieves, restraints, and detainments of all kings, princes, or people," &c.   Did this cover the loss?

Of this there can be no doubt.   It was a loss by *enemies,*

or by *pirates*. The plaintiffs claim that it was a loss by pirates ; the defendants contend that it was a loss by enemies. It is not denied that the latter risk is excepted from the policy by the marginal clause ; therefore the action cannot be maintained, unless the act of Semmes was *piracy*.

I. Piracy, being committed only on the high seas, was not a crime of which the courts at common law had any jurisdiction. 2 Hale P. C., 18, 370. It was a capital offence by the civil law, of which the admiral took cognizance. By the statute 28 Hen. 8, c. 15, jurisdiction of this crime was conferred upon the common law judges. Since that time it has been spoken of ·as an offence at common law. And certain offences not piracy by the civil or the common law, have been made so by statute, both in this country and in England.

It is contended for the defendants, that the word "pirates," in a policy of insurance, must be understood as referring to those only who are guilty of piracy as defined " by the law of nations." But we can perceive no ground for such a restriction. The parties to the contract must be presumed to have understood the laws, at least of this country ; and so far as any kind of *piracy*, whether by the statutes or by the law of nations, could affect marine risks, it must be considered as embraced in that term when used in contracts relating to such risks, unless there is some limitation or exception.

But, in the case at bar, it is unnecessary for us to determine whether the acts of Semmes and his crew were within the provisions of any statute. For the forcible taking of property from the owner, on the high seas, appropriating all that can be of any use, and destroying the rest, are clearly acts of piracy according to the law of nations, or the common law, if committed by the *parties*, and with the *intent*, necessary to constitute that crime.

The common law writers define piracy as consisting of " those acts of robbery or depredation upon the high seas, which, if committed upon the land, would have amounted to felony there." 1 Hawkins P. C., c. 37, § 4 ; 2 East P.

C., 796. It is, therefore, *robbery on the high seas.* This is the definition, in substance, given by the highest court in this country. *United States* v. *Palmer,* 3 Wheat., 610. It is believed to be the only correct definition of the *offence.*

There are cases in which courts, not in *defining piracy,* but in *describing pirates,* have used very different terms. But such descriptions, though generally correct in their application to the cases under consideration, cannot properly be taken as tests by which to determine any other case.

1. It is contended that the officers and crew of the Sumter were not pirates, because they did not "seize, without discrimination, every vessel which they chose to seize, regardless of national character."

Such are said to be the *acts* of pirates, in *Davison* v. *Seal Skins,* 2 Paine C. C., 324. Molloy declares a pirate to be "*hostis humani generis;*" and the same language may be found in the case of *United States* v. *Malek Adhel,* 2 How., 200. It is there said, that "he commits hostilities upon the subjects and property of *all nations.*"

This may, generally, be true in fact. But it by no means follows that such indiscriminate hostility is necessary to constitute the crime of piracy. In the case first cited, THOMPSON, J., says, "the only difference between *robbery* and *piracy* is, that *the sea* is the theatre of action for the one, and *the land* for the other." No one has ever contended that a man could not be convicted of *robbery,* unless he had a general purpose to rob everybody. Such a rule is no more applicable to robbery on the seas, than on the land. If an act of piracy is proved, it surely would not be a good defence for the pirates, that their purpose was to seize vessels belonging to citizens of one nation only; or even that the piratical enterprise was designed for the taking of only a single ship.

Thus, if there is a mutiny of the crew, for the purpose of feloniously taking the ship, *and they succeed,* it is piracy. *Brown* v. *Smith,* 1 Dow. Parl. Cases, 349. The fact that pirates generally have a wider and more indiscriminate pur-

pose, has given rise to more general terms in describing what *they do*. But we are not aware that any court has ever held an act of robbery, committed on the high seas, not to be piracy ; or that any other elements are necessary to constitute the offence.

2. But, it is said that, in the case at bar, the taking was not *animo furandi;* and that, without such *intent*, there can be neither robbery nor piracy.

Common law writers, from the time of Molloy, have applied this term to the crime of piracy. It has also been so applied by the courts in this country. *United States* v. *Smith*, 5 Wheat., 153. But, in the case of the *Brig Malek Adhel*, previously cited, Judge Story is careful to explain, that it is not essential that the act be committed *for purposes of gain*. "If one wilfully sinks or destroys an innocent merchant ship, without any other object than to gratify his lawless appetite for mischief, it is just as much piratical aggression in the sense of the law of nations, and of the Act of Congress, as if he did it solely and exclusively for the sake of plunder, *lucri causa.*"

When, by statute, jurisdiction of this offence was conferred upon the common law courts, it was regarded as a felony. Some authors speak of it as a "marine felony." The taking was charged as "felonious" in the indictments, and the felonious intent was presumed, or proved, as in common law offences. When it said, therefore, that the taking must be *animo furandi*, nothing more is meant than that, as in robbery on the land, it must be with a *felonious* intent. In the case of *Davison* v. *Seal Skins*, before cited, it is said that, "the taking must be felonious." And, in *United States* v. *Jones*, 3 Wash. C. C., 209, 216, Washington, J., says: "The *felonious* taking of goods from the person of another, or in his presence, on the high seas, by violence, or putting him in fear, and against his will, is felony and piracy by the law of the United States."

3. But it is argued that the taking was not felonious in this case, for "what was done was for the purpose of prose-

cuting the *civil war.*" Because the officers and crew of the Sumter acted under commissions issued by a *de facto* government, engaged in levying war against the United States, it is said that they were not *pirates,* but *enemies.*

That they were liable to be regarded as "enemies," is undoubtedly true. This implies the existence of "war." But every forcible contest between two governments, *de facto,* or *de jure,* is war. War is an existing *fact,* and not a legislative decree. Congress alone may have power to "declare" it *beforehand,* and thus cause or commence it. But it may be initiated by other nations, or by traitors; and then it *exists,* whether there is any declaration of it or not. It may be prosecuted without any declaration; or Congress may, as in the Mexican war, declare its *previous* existence. In either case it is the *fact* that makes "*enemies,*" and not any legislative Act.

But in a *civil* war, those who prosecute hostilities against the established government are also traitors. And their acts are robbery or murder on the land, or piracy on the sea. There may be good reasons, after the contest is closed, for absolving many of them from their liabilities to punishment, as has sometimes been done in cases of rebellion. But this can be done only by the legislative power; nor does it change the nature of the crimes they have committed. Their acts are not only acts of war, but also of robbery, murder, or piracy. As was said by Judge Sprague, in the case of the *Amy Warwick,* Law Reporter, April, 1862, "they are at the same time belligerents and traitors, and subject to the liabilities of both; while the United States sustain the double character of belligerent and sovereign, and have the rights of both. These rights coëxist, and may be exercised at pleasure. Thus, we may treat the crew of a rebel privateer as merely prisoners of war, or as pirates and traitors." These views were fully sustained by the Supreme Court of the United States. Prize Cases, 2 Black, 635.

An old writer has very clearly and concisely stated the

law on this subject: — "If subjects of the *same State* commit robbery upon each other, on the high seas, it is *piracy*. If they are subjects of *different States*, if in amity, it is piracy; if at enmity, it is not." Sir LEOLINE JENKINS, cited in 13 Petersdorf, 349, note.

The officers and crew of the Sumter were either subjects of the United States, or of some other government *in amity* with ours. In either case they were pirates. It is not claimed that they were not citizens of the United States. The fact that they were citizens of States that have revolted, and are engaged in civil war, did not change the nature of their acts, except to add to their enormity. The commission under which they acted was itself piratical, making all concerned in issuing it accessories before the fact to all the piracies committed under it. The pretended government that authorized such a commission, being designed to overthrow the only rightful government, made *treason* of all the robberies and murders committed by its authority, on land or sea. When committed on the high seas they were piracy. They were not the less piratical because they were belligerent. The lesser crime was not merged in the greater. *Commonwealth* v. *Squier*, 1 Met., 258. In being treason, such acts did not cease to be robbery and piracy, the same as if they had not been committed in execution of a conspiracy to subvert the government. The intent of *treason* made them not the less, but the more *felonious*. The case falls within that clause of the policy by which the plaintiffs are insured against a loss by "pirates," and they are entitled to recover, unless the loss is also within the *exception* made by the warranty, in the margin.

II. The warranty in this case is not extrinsic, or independent. It is merely an exception, in the margin, of certain risks that are specified in the body of the policy.

"Warranted free from *capture, seizure,* or *detention*, or the consequences of any attempt thereat, any stipulation to this policy to the contrary notwithstanding."

It is worthy of attention, that neither of the words "cap-

ture, seizure, or detention," is used in the body of the policy, in describing the perils insured against. The warranty, though intended to *except* some of the specified risks, does it in different words from those used to *describe* the risks. It is this, only, which makes the case one of difficulty or doubt.

The words used in the warranty are, indeed, also used in the body of the policy in the memorandum clauses, whose office is never to enlarge, but always to limit and circumscribe the risks assumed. *Potter* v. *Insurance Co.*, 2 Sumner, 197. But the use of the word in these clauses does not afford much assistance in determining their meaning in the warranty. For, if *certain kinds* of "seizures," as for a violation of the revenue laws, are excepted in the memorandum clauses, there may still be *other kinds* of seizure not therein excepted, which *are* excepted by the use of the same word, *without limitation* in the warranty.

The body of the policy insures against "enemies." A loss by them is a "capture." This, therefore, is excepted by the warranty.

The body of the policy insures against "restraints and detainments of princes and people." Such a loss, is by "seizure or detention." Therefore *that* is also excepted in the warranty.

The body of the policy also insures against "pirates." If a loss by *pirates* is either a "capture, seizure or detention," *that* is also excepted by the warranty. This is the exact question presented.

These words, though sometimes used synonymously, differ in the *extent* of their meaning — each embracing the one that *follows* it, but not the one that *precedes* it. Every capture is a seizure and a detention, and every seizure is a detention. But there may be a seizure, as for some violation of revenue laws, which is not a capture; and there may be a detention, as by an embargo, which is neither a capture nor a seizure.

This distinction has sometimes been overlooked, because

a seizure, or a detention without a seizure, may sometimes be *equivalent* to a capture, in giving the right to abandon for a total loss. It is difficult, therefore, in some cases, to determine the particular signification of each word. *Black* v. *Marine Insurance Co.*, 11 Johns., 287; *Wilson* v. *Union Insurance Co.*, 14 Johns., 227; *Magoun* v. *N. E. Marine Insurance Co.*, 1 Story, 157.

Though there may be a case of " detention" that is neither a capture nor a seizure; a loss by *piracy* is not one of that kind.

The question is therefore reduced to this:—Does the word " capture," or " seizure," as used in contracts of marine insurance, embrace *a taking by pirates?* If so, it is within the warranty, and the insurers are not liable.

That these words, as commonly used and understood, are broad enough to cover such a case, cannot be doubted. 1 Phil. Insurance, § 1110.

But it is argued that, as used in policies of insurance, they have acquired a particular meaning, which does not embrace such a case. If so, that meaning must be given to them in the policy under consideration. " If any terms in the policy have, by the known usage of trade, or by use and practice ' between the insurers and the assured, acquired an appropriate sense, they should be construed according to that sense and meaning." *Gibson* v. *Colt*, 7 Johns., 385.

The plaintiffs contend that " seizure," used in policies of insurance, embraces only the acts of some government, or of its officers; and that " capture" extends only to the acts of *enemies* in a *public war.* Is the meaning of these words thus restricted, when used in such contracts, so that both the parties must be presumed to have understood them in that sense? Is a *capture* always a *belligerent taking?*

The English cases throw but little light on this question. In *De Paiba* v. *Ludlow*, 1 Comyns, 360, the ship was taken by pirates, and was retaken nine days afterwards. The plaintiff recovered for a partial loss. This taking has been called a " capture," by some authors. Marshall on Insurance,

424. But no such point was decided ; for the risk of pirates was expressly insured against, and there was no exception by a warranty or otherwise.

In *Goss* v. *Withers*, 2 Burr., 693, Lord MANSFIELD is reported to have said that, "as between insurer and insured, a capture by a *pirate* is upon just the same footing as a capture by an *enemy*."

The counsel for the plaintiffs speak of this as a *dictum ;* and the counsel for the defendants seem to regard it as a decision that a piratical taking is a *capture*. It is thus spoken of by the Court of Queen's Bench, in *Kleinworth* v. *Shepard*, 1 El. & El., 447. But it is evidently a mistake. Lord MANSFIELD expressed no such opinion, unless we might infer it by his use of the word " capture," in speaking of pirates. The question before him was the right of the assured *to abandon*, in case of a capture by an enemy. Their right to abandon in case of a taking by a *pirate* was admitted. And he said that, *in regard to the right of abandonment*, the two cases were upon the same footing. The remark was strictly applicable to the point under consideration ; and the correctness of it, as a rule of law, has never been denied. In either case, the insured may abandon at any time before a recovery or a restoration.

In *Naylor* v. *Palmer*, 8 Exch., 739, same case, 10 Exch., 322, the loss was by an insurrection of Coolie passengers. A similar loss seems to have been held a case of *seizure* in *Kleinworth* v. *Shepard*, before cited. In the latter case, the declaration alleged it to be a loss by " piracy," and this was admitted by demurrer. In the former case, there was no such admission. It is doubtful if the Court, in either case, would have held it to be a loss by *piracy*. The *general clause* in English policies is broader than in most American policies, covering " all other perils, losses, or misfortunes." And, though these words have been construed to mean other perils *of a like kind*, they sometimes embrace losses that otherwise would not have been covered by the policy. *Cullen* v. *Butler*, 5 M. & S. 461 ; *Butler* v. *Wild-*

*man*, 3 B. & A., 398. And the decision in *Naylor* v. *Palmer* was put, not on the ground that the acts charged were *actually* piratical, but that they were within the general clause in the policy. "They were either direct acts of piracy, or acts so entirely *ejusdem generis*, that if not reducible to the *specific* words of the policy, they are clearly included in the *general* words." The decision does not rest on the ground that it was either a *seizure* or a *capture*.

Only one American case has been cited. In *McCongo* v. *N. O. Insurance Co.*, 10 Rob. Lou. Rep. 202, 334, it seems to have been held that a loss by an insurrection of slaves, who took the vessel on which they were being transported, and escaped, was a loss by *capture*, or *seizure*. It is not easy to perceive how such a taking could be held to be piratical, even of the *vessel*, if it was taken only for a temporary purpose, in order to escape. The slaves might, however, be said to have *seized* the *vessel*. But we should hardly be willing to assent to the conclusion that they either captured or seized *themselves*, so as to render the insurers liable for their value.

Two, only, of the cases cited, appear to have any direct bearing on the question before us. In *Powell* v. *Hyde*, 34 Eng. Law & Eq., 44, a British vessel was fired upon, by mistake, by a Russian battery. The policy contained an exception of "capture, and seizure, and the consequences of any attempt thereat." It was held that the loss was within the exception, and that the insurers were not liable.

In *Kleinworth* v. *Shepard*, before named, the taking was admitted by the pleadings to have been piratical. The policy contained a warranty in the same terms as in the case before us; and the loss was held to be within the exception, so that the insured could not recover. No distinction can be perceived between that case and the one at bar.

The plaintiffs rely upon the definition given to the word "capture," by the elementary writers upon the law of insurance, as showing that it is not applied to a taking by pirates.

But in this respect such writers do not agree in their definitions, as may be readily seen by a comparison.

Of those who apply it only to a taking by an *enemy*, are the following : —

" *Capture*, as applied to the subject of marine insurance, may be said to be the taking of the ships or goods belonging to the subjects of one country, by those of another, when in a state of public war." Park, c. 4.

" *Capture*, properly so called, is a taking by the enemy as a prize, in time of open war, or by way of reprisals, with intent to deprive the owner of all dominion or right of property over the thing taken." 2 Arnould, § 303.

" *Capture* may be said to be, as applied to this subject, the taking of the ships or goods belonging to the subjects of one country by those of another, in time of war. * * An averment of a loss by *capture* cannot be sustained, unless the ship was taken *jure belli*." Hildyard, Law and Eq. Lib., 288, 302.

Jacob, in his Law Dictionary, has followed Park; and numerous cases might be cited in which courts have used the word in this sense.

Other authors have used the word in a wider sense, embracing *piracy*, and all other tortious takings.

." *Capture* is when a ship is subdued and taken by an enemy in open war, or by way of reprisals, *or by a pirate*, with intent to deprive the owner of it." Marshall, 422.

Phillips, in his work on insurance, is somewhat indefinite; but he says that the " words capture and detention are broad enough to comprehend perils arising from pirates." Vol. 1., 2d ed., 651.

The same definition given by Marshall is repeated in 11 Petersdorf, 180; and in Bouvier's Law Dictionary. Tomlins defines the word as " the taking of a prey, an arrest, or seizure."

And piratical seizures have generally been called " captures," by eminent lawyers and Judges, from Lord MANSFIELD's day to the present time. 1 Conk. Adm., 450;

*Manro* v. *Almeida*, 10 Wheat., 473. The same language is applied to pirates as to belligerents. They are called *enemies* — " *hostes humani generis;* " and are said to " *commit hostilities* upon the subjects of all nations." It is therefore natural and appropriate that their depredations should be called " captures."

There can be no doubt that the words " capture and seizure," in their general signification, are broad enough to embrace a taking by pirates. The plaintiffs rest their case upon the proposition that, in contracts of insurance, these words have acquired a restricted meaning, which does not embrace such a taking. The burden is upon them to establish the proposition; for words are presumed to have been used in their general and ordinary sense, unless the contrary appears. Therefore, unless it is reasonably certain that the parties used and understood the words in a restricted sense, we must construe them as they are generally used and understood. And we cannot come to the conclusion that these words have acquired any special, limited, or restricted meaning. Applied to contracts of marine insurance, they embrace all that, in their ordinary signification, they describe, so far as such risks may be affected thereby. The fact that elementary writers and courts have differed in their understanding or use of them, unless we conclude that those who have used them in a broad and general sense were in error, does not sustain the case for the plaintiffs. This we cannot do. There may be a difference, with no actual conflict. The word " capture" is properly applied to a *belligerent* taking, as stated by Park. We believe it to be just as properly applied to a *piratical* taking, as stated by Marshall; and that an insurance against " capture" would cover both risks, unless the parties specially excepted one or the other.

We might, perhaps, have based the decision on a different ground, as stated in considering the first question presented. Though the taking was piratical, it was also belligerent. War, *in fact*, existed at the time of the loss.

Hostile forces, each representing a *de facto* government, were arrayed against each other, in actual conflict. Its existence would not have been more palpable or *real*, if it had been recognized by any legislative action. And, though it was a civil war, the taking was not the less a *capture* for that reason.

But the other questions were legitimately raised by the facts in the case, and they have been argued by able and eminent counsel. We have endeavored to give the subject the attention it deserved, and have come to the conclusion that such a felonious and forcible taking on the high seas was both piratical and belligerent, and in either case was a capture and a seizure, within the terms of the warranty; and that the insurers are not liable. The default is therefore to be stricken off, and the case to stand for trial.

APPLETON, C. J., KENT, WALTON, DICKERSON and DANFORTH, JJ., concurred, holding that the taking, whether piratical or not, was the act of a belligerent, and to be regarded as a capture.

CUTTING and BARROWS, JJ., dissented, holding that the taking was piratical, but not a capture, seizure or detention, as understood in contracts of insurance.