SAMUEL A. SWINNERTON ET AL., RESPONDENTS, *v.* THE COLUMBIAN INSURANCE COMPANY, APPELLANTS.

*Marine Insurance—Exceptions in Policy—State of Civil War—Historical Facts as Evidence.*

To create belligerent rights it is unnecessary that there should be war between independent powers.   They may exist between parties to a civil rebellion.

A civil war exists whenever the regular course of justice is interrupted by revolt, &c., so that the Courts cannot be held open.

On the 21st of April, 1861, a civil war existed in Norfolk, Virginia, and the taking of Plaintiff's vessel under the pretended authority of Virginia, and loading the same with stones, and sinking the same, to obstruct navigation, was one of the acts of such war, and caused the loss to fall within the exceptions of the policy of insurance.

Matters of public history affecting the whole people, Courts will take judicial notice of, and will resort to such documents as may be at hand and be worthy of confidence.

THIS is an action to recover upon a policy of insurance, executed by the Defendants in September, 1860, upon one-sixteenth part of the schooner "Lawrence Waterbury," for one year from its date; the policy containing in the margin a warranty, "free from loss or expense arising from capture, seizure, or detention, or the consequences of any attempt thereat."   The body of the policy was in the usual form of a marine policy.

In February, 1861, while the vessel was on a voyage from St. Marks, Florida, to New York, and while the policy was still in force, she was disabled by a storm at sea, and forced to put into Hampton Roads, where she was stranded on the beach, and remained there until about the 30th of March, 1861, when the master and wrecker succeeded in getting her off, and taking her into Norfolk, Virginia, for repairs.

On the 21st of April, 1861, while the schooner was undergoing these repairs at Norfolk, thirty or forty men seized her, broke open her cabins, filled her with stones, took her down about a mile below Norfolk, toward Fortress Monroe, and sunk her in the channel of the river.

The captain of the schooner (who was also part owner, and one of the Plaintiffs—Swinnerton), remonstrated with the men who were engaged in this proceeding, stated to them that he was master, and resisted their proceedings by ordering them to desist and leave, but without effect. The man who was giving orders to the others to throw the stones aboard, and who, Swinnerton testified, "appeared to be the boss, or head man," paid no attention to the protest and remonstrances of the captain, but merely remarked "that the State of Virginia was good for it;" and when asked by what authority he had possession of the schooner, replied "that it was by authority of the State of Virginia."

The captain also applied to a lawyer for legal assistance, and to a military man to whom several persons referred him, but could get none. He also applied to see if he could get the vessel up, but could get no satisfaction. He testified that "it was all confusion then in the place; it was a perfect mad-house." The persons engaged in this work cut through the schooner's deck, and put about one hundred tons of stone on board her.

A steamer lay alongside her all the time she was being filled, and when filled took her away to the place where she was sunk, as before stated. There was a great deal of cheering and hurrahing when she went off.

The captain testified further, that he had not violated any law or regulation of the port, and was not notified that he had, nor charged with having done so. The vessel was never recovered.

Due notice of abandonment of the vessel to the Defendants was served upon them in proper time by the Plaintiffs; and due proof of interest in the vessel, and of her loss, was in like manner made and delivered by the Plaintiffs to the Defendants, in New York, May 7, 1862; the captain of the vessel not being able to leave Norfolk until the 27th of April, 1861.

The Defendants' counsel moved for a dismissal of the complaint, on the ground that the testimony, in connection with the history of the times, showed that the seizure and detention of the vessel was by direction or permission of the authorities of the

State of Virginia, or of the city of Norfolk, in which case, they allege, the loss would fall within the exceptions of the policy, or else it showed that the Plaintiffs did not make a proper resistance to the seizure, or a sufficient effort to procure the protection of the authorities.

The Court denied the motion, and the Defendants excepted.

The Defendants' counsel then offered to read the "Secession Ordinance" passed by the State of Virginia on the 17th of April, 1861. The Plaintiffs objected to the reading of the ordinance as matter of evidence, on the ground that it was immaterial and irrelevant.

The Court sustained the objection, but permitted it to be read, to fix its date. It was read accordingly. It purported to be a declaration and ordinance by "The People of Virginia," that the union between the State of Virginia and the other States, under the Constitution of the United States of America, was thereby dissolved, and that the State of Virginia was in the full possession of all the rights of sovereignty which belong and appertain to a free and independent State, and that the Constitution of the United States of America was no longer binding on any of the citizens of Virginia; and the same ordinance further declared, that it should take effect and be an act as of its date, when ratified by a majority of the votes of the people of Virginia, cast at a poll taken on the fourth Thursday of May, 1861, in pursuance of a schedule thereafter enacted.

The protest of the master of the vessel (Swinnerton), made in New York, on April 30, 1862, detailing the circumstances of the loss of the vessel, was read in evidence by the Defendants. The facts which it alleged or recited are substantially those above stated to have been established by the Plaintiffs' testimony. This was all the testimony introduced or offered. The Defendants' counsel then requested the Court to charge the jury that, if the seizure and detention were by the authorities of the State of Virginia, or the city of Norfolk, it was within the exception of the policy warranting the insurers free from loss or expense in case of seizure or detention, and the Plaintiffs were not entitled to recover.

11

The Court refused to do so, decided that there was no question for the jury, and directed a verdict for the Plaintiffs to the amount of their claim as proved. The Defendants' counsel excepted, and the jury found a verdict for the Plaintiffs, as directed, for $1,065.62.

The General Term of the Superior Court of the City of New York affirmed the judgment entered upon this verdict.

From this judgment the Defendants have brought their appeal to this Court.

*Thomas G. Shearman* for Appellants.

*John H. Reynolds* for Respondents.

Hunt, J.—The body of the policy on which this action is brought contains the following clause : " Touching the adventures and perils, which the said Columbian Insurance Company is contented to bear and take upon itself, in this voyage, they are of the seas, men-of-war, fires, enemies, pirates, rovers, thieves, jettisons, letters of mart and countermart, reprisals, taking at seas, arrests, restraints and detainments of all kings, princes, or people of what nation, condition, or quality soever."

In the margin of the policy is the following statement : " Warranted free from loss or expense arising from capture, seizure, or detention, or the consequences of any attempt thereat."

It is clear upon authority that the recital last quoted constitutes a warranty on the part of the assured, and that it is a qualification of the obligation of the insurer, contained in the covenant before cited (Dole v. Merchants' In. Co., 51 Maine, 465 ; Dole v. New Eng. In. Co., 6 Allen, 373 ; Fifield v. In. Co., 47 Pa. R. 166 ; The Prize Cases, 2 Black's R. 635).

It is held in the same cases that the capture of an insured vessel by a cruiser of the so-called Confederate States is within this warranty, and relieves the insurer from liability upon the policy.

These decisions were based upon the principle that when a portion of the citizens of a civil government have rebelled, established another government, resorted to arms to maintain it, and the rebellion is of such magnitude that the military and naval

forces of the government have been called out to suppress it, they are to be regarded as belligerents.

To create belligerent rights, it is not necessary that there should be war between separate and independent powers. They may exist between the parties to a civil war. A state of actual war may exist without a formal declaration of it by either party; and this is true both of a civil and a foreign war. A civil war exists whenever the regular course of justice is interrupted by revolt, rebellion or insurrection, so that the Courts cannot be kept open (2 Black, Prize Cases, 667, 668). It is further held, by the same authorities, that the capture of an insured vessel by an unorganized body of men, who are thieves, robbers, and pirates, simply, with no pretence of authority from an organized government, does not relieve the insurer from liability, under the clauses in question.

I shall examine the questions arising in this case, upon this theory of the rights of the parties.

On the 21st of April, 1861, the Plaintiffs' vessel was undergoing repairs in the port of Norfolk, Virginia, where she had been driven by stress of weather.

On the morning of that day, a body of men, thirty or forty in number, took her from the place where she was being repaired, and towed her to a wharf in another part of the city. Here, aided by an equal number of men on the wharf, they broke open the cabins of the vessel, filled her with stones, and took her about a mile down the river. She was towed off amid the cheers and shouts of those on shore, and sunk at the mouth of the channel. The person conducting these operations paid no attention to the remonstrances of the captain, but informed him that what he did was by authority of the State of Virginia.

The captain could obtain no aid from the military, and no relief from the Courts. It was a scene of public excitement—as the witness terms it, of madness—the occasion of which will appear hereafter.

Properly to appreciate the condition and rights of the parties, it is necessary to look at the state of the country on the 21st of April, 1861, when the events we have detailed occurred.

The written constitution, under which the government of the "United States of America" was formed, was adopted in 1787.

At the close of the war with Great Britain, in which its independence was accomplished, the Union was composed of thirteen States. In 1861 the Union consisted of thirty-six States, possessing many rights independent of each other, and independent of the United Government formed by them. Of these States Virginia was one, South Carolina, Georgia, Mississippi, Alabama, Texas, and Florida, were others. The disputes and jealousies existing between the different sections of the country, and the people of the different States, took form and shape in the autumn of the year eighteen hundred and sixty. The elections held in November of that year resulted in the choice of Abraham Lincoln as President of the United States. A portion of the Southern States, professing to consider this result, and the principles of the successful party, as destructive of the institution of African slavery then existing in those States, determined to withdraw from the Union. The right thus to withdraw had been claimed by those States for many years, while the claim had been steadily and uniformly denied by the Northern States. On the twentieth of December, eighteen hundred and sixty, with ostentatious defiance, the State of South Carolina, by a convention called to act upon this particular subject, declared that the ordinance of seventeen hundred and eighty-eight, whereby the Constitution of the United States was ratified, and all acts of the State of South Carolina ratifying amendments of that constitution, were repealed, and declaring "that the union now subsisting between South Carolina and other States, under the name of ' The United States of America,' is hereby dissolved."

The raising of armies, and the appointment of commissioners to proceed to Washington to demand the delivery to that State of all forts, light-houses, and magazines within its limits, and also for the apportionment of the public debt and a division of all the public property of the United States, immediately followed.

During the months of January and February then next, the

States of Mississippi, Alabama, Louisiana, Florida, and Texas adopted ordinances to the same effect.

In the month of February, eighteen hundred and sixty-one, the deputies from these States assembled at Montgomery, in the State of Alabama, and organized a government upon the same general plan as the one then and now constituting the Union of the States of America. They elected a president and vice-president, and organized a congress to consist of senators and members from the several States forming their nation. A cabinet of executive officers was selected, the moneys and credits of the government were issued; commissioners for foreign States were appointed; military, naval, and civil officers were designated; a national emblem was assumed, and all the forms of a permanent and an efficient government were adopted, with the name of ." The Confederate States of America." The States of North Carolina, Virginia, Tennessee, Missouri, and Arkansas subsequently joined this confederacy.

·It is sufficient, for the purpose of deciding the legal questions before us, to say that the rebellion thus organized assumed gigantic dimensions.

A war was carried on for four years by land and by sea between the two governments, with varied success on the part of the different armies.

It terminated in the triumph of the government and the complete overthrow of the rebellion, in the spring of eighteen hundred and sixty-five ; but not until the government had expended three thousand millions of dollars in its suppression, and three hundred thousand Northern soldiers had laid down their lives in thus maintaining the integrity of their government.

These subsequent and important transactions, to which I have alluded so briefly, are competent to be considered in determining the status, in the month of April, 1861, of the parties whose acts we are to consider (Prize Cases, sup.).

When the State of South Carolina attempted its separation from the Union, its harbor contained several forts garrisoned by United States troops.

Both the soil and jurisdiction of these forts belonged to the United States, and that government declined to yield them to the repeated and urgent demands of South Carolina. Major Robert Anderson, of the United States Army, was in command of these forts in this month of April, and had transferred his men and munitions from Fort Moultrie to Fort Sumter, both being forts within a short distance of the city of Charleston, and in its harbor.

General Beauregard, who had been appointed by the Confederate States a brigadier-general in their service, was in command of the troops in the city of Charleston.

The refusal to surrender Fort Sumter being persisted in, that officer, on the 12th day of April, by the special order of the Secretary of War of the Confederate States, opened fire upon the fort. The preparations for its reduction had long been in progress; seventy men only formed its garrison, and seven thousand men formed the attacking force.

An unarmed vessel, loaded with provisions for the relief of the garrison, had been fired upon by the Confederate authorities, and compelled to abandon her purpose. After a siege of twenty-four hours, its men exhausted, its supplies consumed, and its quarters on fire, the fort was surrendered.

Its commander, with his forces, marched out with the honors of war, saluting the flag of his country as it was lowered.

The news of this surrender was telegraphed to the authorities at Montgomery. In answer to the congratulations of the assembled multitude, L. Pope Walker, Secretary of War of the Confederate States, announced the intention of his government to pursue its success, and predicted that, before the first of May following, the Confederate flag would float in triumph from the Washington Capitol.

On the fifteenth day of April, President Lincoln issued a proclamation, reciting that the execution of the laws of the United States was obstructed in the States of South Carolina, Georgia, Alabama, Florida, Mississippi, Louisiana, and Texas, by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals by law,

and calling forth the militia of the several States to the number of seventy-five thousand.

Within ten days thereafter, the President of the Confederate States issued a proclamation that he would grant letters of marque against the commerce of the United States, and did issue many commissions of that character.

This call of President Lincoln was contemptuously refused by the Southern States, but earnestly and immediately responded to by the Northern States. The men needed were at once supplied.

The Sixth Regiment of Massachusetts Volunteers, while passing through the city of Baltimore, on the nineteenth of April, in response to the President's call, was attacked by a mob. The most of the soldiers were raw recruits, unarmed, and separated from their officers. Three of the soldiers were killed, many were severely injured, and many of the mob were killed and injured. The railroads leading to and from the city of Baltimore were torn up and blockaded; troops and supplies could only reach Washington by a circuitous route, and that city was for a time in a state of substantial blockade.

The excitement created by these transactions was scarcely inferior to that created by the attack upon Sumter. It pervaded all classes and all sections, receiving approval or condemnation according to the position of the parties affected.

Before referring to the condition of public affairs in Virginia at the time of the capture of the vessel in question, the following extract from the Southern historian of the war will illustrate the condition of the country at the close of Mr. Buchanan's administration: "When he ceased to be President, on the fourth of March, eighteen hundred and sixty-one, seven Southern States went out of the Union; they had erected a new government; they had secured every Federal fort within their limits, with two exceptions, Sumter and Pickens; they had gathered not only munitions of war, but had obtained great additions in moral power; and although they still deplored a war between the two sections as a 'policy detrimental to the civilized world,' they had openly and rapidly prepared for it.

"Fort Moultrie and Castle Pinckney had been occupied by the South Carolina troops. Fort Pulaski, the defence of Savannah, had been taken; the arsenal at Mount Vernon, Alabama, with twenty thousand stand of arms, had been seized by the Alabama troops; Fort Morgan, in Mobile Bay, had been taken; Forts Jackson, St. Philip, and Pike, near New Orleans, had been captured by the Louisiana troops; the Pensacola Navy-yard, and Forts Barrancas and McRae, had been taken, and the siege of Fort Pickens commenced; the Baton Rouge Arsenal had been surrendered to the Louisiana troops; the New Orleans Mint and Custom-house had been taken; the Little Rock Arsenal had been seized by the Arkansas troops; and on the eighteenth of February Gen. Twiggs had transferred the military posts and public property in Texas to the State authorities" ("The Lost Cause"; by Edward A. Pollard, pp. 98, 99).

Virginia was ultimately a member of the Southern Confederacy, and, in the desolation of her territory by contending armies, illustrated the horrors of civil war.

At this time she was in active sympathy with the Confederates, and at once refused to comply with President Lincoln's call for men to sustain the country.

On the 17th of April the convention of the State of Virginia passed its ordinance of secession. That portion of it which required its submission to the popular vote was entirely disregarded. The State put itself in active and immediate co-operation with the Southern Confederacy.

On the same day another ordinance was passed, "to call volunteers into the service of the State" (Laws of Va. 1861, App. 8).

The Governor issued a proclamation under this ordinance, calling upon the militia to hold themselves in immediate readiness; and in reference to President Lincoln's call for men, he uses this language: "That Virginia, by a majority approaching to entire unanimity, declared, at its last session, that the State would consider such an exertion of force as a virtual declaration of war, to be resisted by all the force at the command of Virginia; and sub-

sequently the State Convention, now in session, reaffirmed the same policy with almost equal unanimity."

In refusing to respond to this call, Gov. Letcher closes his communication in these words: " You have chosen to inaugurate civil war, and we will meet it in a spirit as determined as the administration has exhibited toward the South (An. Reg. 1861, "Virginia ").

On the day of the passage of the ordinance of secession, the printed sign, "United States Court," in the Custom-house building, was taken down, and the Confederate flag was raised on the Capitol, in which the convention was sitting. The Custom-house was taken out of the hands of the United States officials, and placed under a guard of State troops. The steamships York-town and Jamestown (private property) were seized and put in charge of Virginia State troops (id.).

On the night of the 16th of April, says the historian Gree-ley (Am. Conflict, vol. 1, p. 471), "the channel of the Elizabeth River, near Norfolk, was obstructed by sinking two small vessels therein, with intent to preclude the passage, either way, of Federal ships of war. The number appears to have been increased during the following nights, while a hastily collected force under Gen. Taliaferro, a Virginia brigadier, who reached Norfolk from Richmond on the 18th, was reported to be preparing to seize the Navy-yard and Federal vessels during the night of Saturday, the 20th."

At this yard were the valuable steam-frigate Merrimac, the Cumberland, Germantown, Plymouth, Raritan, Columbia, Dol-phin, Pennsylvania, Delaware, and Columbus, with nearly two thousand cannon, and immense quantities of arms, munitions of war, naval stores, and timber (id. 473).

On the 21st of April all these vessels were sunk or burned, and all this property destroyed, by the United States authority, under the direction of Capt. Paulding of the navy, to prevent its falling into the hands of the rebels. Cannon were spiked, the muskets and revolvers broken, shot and shell thrown into the water, the ships scuttled or fired, and the barracks set on fire. As soon as

the United States troops had departed, a volunteer company took formal possession in the name of the State of Virginia, and raised her flag on the ruins (id. 476).

In describing the effect upon Virginia of President Lincoln's proclamation of April 15th, calling for seventy-five thousand men, Mr. Pollard says: " Two days after the interview of her commissioners with President Lincoln, her people were reading his call for a land force of seventy-five thousand men; and almost instantly thereafter the proud and thrilling news was flashed over the South, that Virginia had redeemed the pledges she had given against coercion, and was no longer a member of the Federal Union, but in a new, heart to heart, defiant union with the Confederate States of the South " (Lost Cause, p. 116).

The same authority says that, " on the 29th of April, President Davis (of the Confederate States) wrote to the Confederate Congress, then convoked by him : ' There are now in the field, at Charleston, Pensacola, Forts Morgan, Jackson, St. Philip, and Pulaski, nineteen thousand men, and sixteen thousand men are now en route for Virginia. It is proposed to organize and hold in readiness for instant action, in view of the present exigencies of the country, an army of one hundred thousand men' " (id. 117).

In another place he says: " Virginia had taken her decisive step, and passed her ordinance of secession, on the 17th day of April. It became an immediate concern to secure for the State all the arms, munitions, ships, war stores, and military posts within her borders which there was power to seize.

" Two points were of special importance—the Navy-yard, at Gosport (opposite to Norfolk), with its magnificent dry-dock, its huge ship-houses, shops, forges, warerooms, rope-walks, seasoned timber for ships, masts, cordage, boats, ammunition, small-arms, and cannon. Besides all these treasures, it had lying in its waters several vessels of war.

" The other point was Harper's Ferry, on the Potomac River, with its armory and arsenal, containing about ten thousand muskets and five thousand rifles, with machinery for the purpose of

manufacturing arms, capable of turning out twenty-five thou
sand muskets a year" (id. 122).

A large force of Virginia volunteers, to the number of 2,500,
was immediately collected to attack Harper's Ferry.   To prevent
its falling into their hands the garrison set fire to the arms and
buildings, and escaped across the railroad bridge into Maryland.

The historian above quoted says: " The retreating garrison had
laid trains to blow up the workshops, but the courage and rapid
movements of the Virginians extinguished them, and thus saved
to their State the invaluable machinery for making muskets and
rifles." This was on the 18th day of the same month of April.

It is impossible to shut our eyes so closely as not to see that a
war had actually been commenced against the United States gov-
ernment before the 21st of April, 1861.  The evidences I have
cited are unanswerable.   The formal passage of the ordinance of
secession by Virginia, the immediate appointment of commis-
sioners to the Confederate government, the sinking of vessels in the
channel, the presence of armed troops, the destruction of the navy-
yards, the assault on Harper's Ferry, the avowed declarations of
the authorities of the State that she was to range herself with her
Southern allies, the concentration of military forces at Norfolk,
the declaration by the officer in charge that this vessel was seized
by authority of the State of Virginia, her sinking to obstruct
the passage of United States vessels to this port, the shouts and
applause of the people, the excitement pervading all classes, the
impossibility of finding aid in the Courts, afford the strongest
reason to conclude that this seizure was an act of war, and not the
act of a mob.   The actors were not hostes humani generis, nor
did they act causa lucri.

The act of April 21st, 1861, is to be received and passed upon
as we now, in 1867, see and understand it.   It doubtless had
greater significance than many of its actors were aware of, and
was a prelude to a contest anticipated by none (Prize Cases, sup.
2 Black).

No declaration of war is necessary to give to individuals, or
to nations, the rights resulting from that condition of society.   It

is the actual condition that produces the result, and not the presence or absence of a declaration to that effect by either party.

In the contest between the United States and Mexico, in 1846, the battles of Palo Alto and Resaca de la Palma had been fought before the passage of the act of Congress of May 13th, 1846, which recognized "a state of war as existing by the act of the Republic of Mexico."

This act not only provided for the future prosecution of the war, but was itself a vindication and ratification of the act of the President, in accepting the challenge without a previous formal declaration of war by Congress (Prize Cases, 2 Black, 668).

With the light reflected upon them by subsequent events, it would be absurd to say that the taking of Fort Pulaski, which was the sea-coast defence of Georgia; or the seizure of Forts Jackson and St. Philip, which defended the approach to New Orleans ; or the attack upon Harper's Ferry, a depot and manufactory of fire-arms, were the acts of riotous individuals simply ; or to say that the surrender of Gen. Twiggs, by which an empire in extent, an army in numbers, and a fortune in property, were transferred to the rebellion, was the illegal act of an individual simply; or to say that their acceptance by the State of Texas was a private and unauthorized transaction only. Each of these acts was in pursuance of a purpose well understood. They were intended, as they were calculated, to weaken the military power of the government, and strengthen that of the States named, to furnish the means of rebellion, and to destroy the power to suppress it. Whether the act of seizing and destroying the Plaintiffs' vessel was a part of the same scheme, was a question for the jury. I think proof of the ordinance of secession was competent, and that the general question of the object and character of the seizure should have been submitted to them. I have not overlooked the objection made by the Respondent to the consideration by this Court of the facts of history, to which I have referred.

It is objected that the case contains no evidence of the existence of a civil war; that it does not show that the mob was act-

ing by any public authority, and that no historical proof was offered to the Court, by any authentic history, that the condition of things existed, as we are all aware they did exist, in fact.

This objection I do not consider a sound one. The rule I take to be this—that matters of public history, affecting the whole people, are judicially taken notice of by the Courts ; that no evidence need be produced to establish them ; that the Court, in ascertaining them, resorts to such documents or reference as may be at hand, and as may be worthy of confidence. Thus, in the Prize Cases already cited (2 Black's R. 667), the Court uses this language : " The actual existence of civil war is a fact in our domestic history which the Court is bound to notice and to know."

Knowledge of the main fact would necessarily carry with it knowledge of the particular acts of war which created that condition of things.

Upon a careful reading of these cases, as reported, as well as of the arguments of counsel on both sides, and of the opinion of the Court, and the dissenting opinion of Judge Nelson, I see no statement that proof was made of any of the general facts of the early history of the rebellion. Particular proclamations were read, correspondence with foreign authorities was referred to, the special facts of the capture of the vessels and their circumstances were proved, and the general facts connected with the history of the country seem to have been assumed as within the judicial cognizance of the Court. I have quoted the language of the Court on this point, and it was not denied by counsel against whom it applied, nor doubted in a dissenting opinion which holds that, until the passage of the act of Congress of July 13th, 1861 (but three days before the first battle of Bull Run), no war existed, in a legal sense, between the armed hosts of the different sections of the country ; but that it was simply " a personal war against the rebels," on the part of the President. The general language of the Court is, therefore, entitled to full significance.

Mr. Greenleaf says, in his work on Evidence (at §§ 4, 5, 6): " All civilized nations being alike members of the great family of

sovereignties, may well be supposed to recognize each other's existence, and general public and external relations.   The usual and appropriate symbols of nationality and sovereignty are the national flag and seal.   Every sovereign, therefore, recognizes, and of course the public tribunals and functionaries of every nation take notice of, the existence and titles of all the other sovereign powers in the civilized world, their respective flags, and their seals of State.   In like manner the law of nations, and the general customs and usages of merchants, as well as the public statutes and general laws and customs of their own country, are recognized, without proof, by the Courts of all civilized nations ; neither is it necessary to prove things which must have happened, according to the ordinary course of nature ; nor to prove the course of time, or of the heavenly bodies ; nor the ordinary public fasts and festivals ; nor the coincidence of days of the week with days of the month ; nor the meaning of words in the vernacular language ; nor the legal weights and measures ; nor any matters of public history affecting the whole people.   Courts also take notice of the territorial extent of the jurisdiction and sovereignty exercised de facto by their own government ; and of the local divisions of their country, as into states, provinces, counties, cities, towns, local parishes, or the like.   They will also judicially recognize the political constitution or frame of their own government ; its essential political agents or public officers sharing in its regular administration, and its essential and regular political operations, powers, and action.   Thus notice is taken, by all tribunals, of the accession of the chief executive of the nation or State under whose authority they act ; the genuineness of his signature ; the heads of departments, and the principal officers of State ; the election or resignation of a senator of the United States ; the appointment of a cabinet or foreign minister.

" In fine, Courts will generally take notice of whatever ought to be generally known within the limits of their jurisdiction.   In all these and the like cases, where the memory of the Judge is at fault, he resorts to such documents of reference as may be at hand, and he may deem worthy of confidence."

In the Bank of Augusta *v.* Earle (13 Peters' R. 590), Ch.J. Taney says: "And it is a matter of history, which this Court is bound to notice, that corporations, created in this country, have been in the open practice, for many years past, of making contracts in England, of various kinds and to very large amounts, and we have never seen a doubt suggested there of the validity of these contracts."

In Jack v. Martin (12 Wend. 328), the Court expressed the opinion that it was warranted in taking official notice of the existence of slavery in Louisiana, as a part of the public history of the country. For other instances of what is officially noticed by the Courts, I refer to 3 Com. R. 188; 17 Wend. R. 88; 4 Seld. R. 182; 10 Barb. R. 406; 20 N. Y. R. 65; 6 Duer, 633; 3 Sand. Ch. 571; 6 Hill, 475; 7 Cow. 429; 7 Wend. 460; 16 N. Y. R. 125; 4 Kern. 623).

I entertain no doubt that the historical facts necessary to the decision of the case were proper for the judicial consideration of the Court, without the production or offer of proof.

I have cited the histories of Mr. Greeley and Mr. Pollard, not as authorities, nor because any authorities were needed, but as containing condensed and satisfactory statements of the particular facts which were useful for the purposes of this action, and for the reason that the two historians, differing toto cœlo in their views and feelings, give concurrent statements of the facts in question. I should not deem it necessary that any history should be cited, or any proof made, to show that Henry the Fifth conquered France, or that his son lost it; that Charles the First was beheaded; that Napoleon the First established an empire, and died in exile. These are facts of general history, the truth of which Courts would hold and juries would find, assuming their existence.

It is none the less a fact, in general history, that Mr. Lincoln was President of the United States, and that he was assassinated while holding that office.

It is none the less true and none the less historic, that a war between the different sections of the United States occurred as I

have recited, and that its origin in Virginia was based upon the facts I have stated.

This rule is limited to no particular lapse of time, and to no particular class of facts, except that they shall be those of general history.

A new trial should be ordered.

DAVIES, Ch.J., and WRIGHT, J., for affirmance.

Reversed.